Henry L. Sutherland and Lucile Sutherland v. Commissioner.
Sutherland v. Commissioner
Docket No. 3110-64.
United States Tax Court
T.C. Memo 1966-155; 1966 Tax Ct. Memo LEXIS 124; 25 T.C.M. (CCH) 822; T.C.M. (RIA) 66155; June 30, 1966
Lucile Sutherland, 1328 N. Alvarado St., Los Angeles, Calif., for the petitioners. Morley H. White, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1960 in the amount of $259.45. Respondent, during the trial herein, conceded the issues relating to depreciation of a sewing machine and telephone expenses; therefore, the issues remaining for decision are: (1) Was petitioner Lucile Sutherland engaged in the trade or business of producing records and promoting her daughter as a singer; (2) in the event said petitioner *125 was engaged in such a trade or business, were the expenses incurred therein capital expenditures for the cost of acquiring a capital asset and, therefore, amortizable over the life of the asset or deductible in the year of its abandonment; (3) if the foregoing expenses should properly be capitalized, was the capital asset abandoned in 1961 instead of 1960; and (4) whether loss due to termite damage is deductible in the year discovered. Findings of Fact Petitioners Henry L. Sutherland and Lucile Sutherland (hereinafter sometimes referred to as Lucile) timely filed a Federal joint income tax return for the calendar year 1960, and on May 1, 1962, filed an amended Federal joint income tax return for the calendar year 1960. Both of these returns were filed with the district director of internal revenue, Los Angeles, California. Petitioners' daughter, Dorothy Linda Sutherland (hereinafter referred to as Linda), goes by the stage name of Linda Padgett. At the time of trial herein, Linda was 28 years old. When Linda was 14 years of age, Lucile decided that Linda had a good voice for singing. Linda's career as a singer developed over several years. When she was at or about 14 years of *126 age, she took voice lessons - one year of classical singing and one year of popular singing. At or about the age of 16 and thereafter, Linda sang for benefit shows and road shows, for which services she was compensated. In 1959 Linda began recording (or "dubbing") demonstration records (or "dubs") for music publishers. The "dubs" which she recorded were used by said publishers to determine quality of the song thereon and not necessarily the voice of the recording artist. She received compensation for recording "dubs." Prior to 1959 Lucile decided to record popular music. She had always considered herself possessed of considerable musical ability and had been interested in the "music world." Moreover, certain changes in the record industry had occurred since 1956 which made entry therein relatively facile for persons with limited capital resources. Until 1956 the record industry operated as follows: The large recording companies would contract with vocalists on a longterm basis (seven years). The record companies themselves would record the performance of such persons, mass produce records, and control the promotion of artists under contract as well as the distribution of any records *127 they made. In or about 1956 single individuals, or small groups thereof, began to record at their own expense the performances of certain vocalists. Such records are referred to in the trade as "master" records. Master records would then be "leased" or sold to large record companies by which they would be mass produced, promoted, and distributed. It was the master record phase of the record industry into which Lucile decided to enter. Linda had received offers from several individuals and record companies, including Columbia Records, to promote her singing career. Despite the offers from other companies to promote Linda, she decided to contract with her mother rather than any other person or company after concluding that it would be more beneficial to her. Consequently, on March 28, 1958, Lucile entered into the following agreement with Linda: This agreement entered into this 28th day of March, 1958, between Lucile Sutherland hereinafter called "Producer" and Linda Padgett hereinafter called "Artist." The Producer agrees to promote Artist in the field of music and entertainment in the following ways: Producer will pay for all recording sessions, of above named Artist, and all *128 expenses (studio time, musicians, arrangers, pressings, etc.) in conjunction with said recordings and for promotion of said recordings. In consideration for money and time expended, Producer will receive five percent (5%) of [Artist's] gross earnings from any and all recordings paid for by Producer. This contract covers a period of seven (7) years. Lucile Sutherland - Producer Linda Padgett - Artist The first step in producing a master record is to find a song, preferably a new one. Lucile came across two songs written by Clyde Pitts (hereinafter referred to as Pitts). These particular songs had been copyrighted, but were unpublished - that is, Pitts retained the publishers' rights to these two songs. He offered to sell Lucile the publishers' rights to said songs for $600. However, Lucile rejected his offer. Nevertheless, Pitts allowed Lucile to record his songs. The second step in producing a master record is to engage an "arranger." Lucile engaged a man named Ralke to arrange the songs which she was to record. For his services she paid him the sum of $324. Third, the producer of a master record must actually record the song selected and arranged. After several rehearsals *129 at her home, Lucile recorded Pitts' songs, with Linda vocalizing, at the Whitney Recording Studios. Lucile paid the following amounts to Whitney Recording Studios: February 8, 1960
$ 79.98
March 16, 1960
409.12
March 16, 1960
93.60
March 20, 1960
43.68
Total
$626.38
In the meantime Pitts had sold the publishing rights to the songs recorded by Lucile to George Morris (hereinafter referred to as Morris), who owned Toppa Records, a relatively small record company. Since many large record companies will not promote or distribute the recording of a song whose publishing rights they do not own, Lucile and Linda were, for practical purposes, precluded from selling or leasing to such companies the master records which they recorded. They believed that their only resort was to offer the master records to Morris. On December 2, 1960, Morris d/b/a Toppa Records, entered into a contract with Linda. Said contract was for the purpose of promoting two master records produced by Lucile and sung by Linda. It provided, inter alia, that Toppa Records would pay Linda "a royalty of 3% of retail price for 90% of all recordings of any type or kind, sold and paid for in the United *130 States embodying 100% performances of the master recordings" involved therein. It also provided for "one-half the amount of such royalty for all recordings of any type and kind, sold and paid for in the United States embodying 100% performance of only one of the master recordings" involved therein. For use of less than 100 percent of the recordings, the royalty would be based on the portion actually used. The contract also enabled Morris, d/b/a Toppa Records, to lease the two master records involved. On February 9, 1961, Morris entered into a contract with Dot Records, Inc., whereby he released the master records recorded by Lucile and Linda to Dot Records, Inc., for a royalty interest. On the same date Linda entered into a contract with Dot Records, Inc., wherein she acknowledged the aforesaid contract between Morris and Dot Records, Inc., and agreed, inter alia, to the following: 3. For a period of six (6) months from the date hereof you [Linda] agree not to perform for the purpose of making phonograph records for any record company other than us. For a period of seven (7) years from the date hereof you agree not to perform for the purpose of making phonograph records, any *131 of the compositions recorded hereunder and sold to us, for any person, firm or corporation other than us. You agree that your services are unique and extraordinary and that the release or projected release of records made by you in breach hereof would cause us immediate and irreparable harm entitling us to specific performance of this paragraph, to a temporary injunction restraining recording or release of said performances in addition to all other remedies available to us. Lucile was aware of and approved of the contract between Morris, d/b/a Toppa Records, and Linda. The state of Lucile's health became grievous in 1960 and worse in 1961. Finally it caused Lucile to give up the production of master records. Neither Lucile nor Linda earned any money from the production of master records. At all times relevant hereto, Lucile believed that the "sound" of a popular record is the primary factor in its salability; that the vocalist is a secondary and an essentially fungible element in a popular record. Petitioners own their own home. After purchasing and moving into said home, they noticed that termites had done substantial damage to the floors. The termite problem was corrected *132 at that time. Petitioners did not, however, have all of the floors repaired immediately, but only repaired portions of the floors at such times when such portions felt weak. Several years later petitioners noticed termites swarming against a wall of their home. They were informed that termites had eaten a hole in the wall of a bedroom. Petitioners had such damage repaired at a cost of $144.60, of which they paid $59.60 in 1960. Opinion The first issue we must decide is whether Lucile's venture into the production of master records and promotion of Linda as a singer constituted a "trade or business" for purposes of section 162 of the Internal Revenue Code of 1954. The term "trade or business" has a broad meaning which has been defined as including "that which occupies the time, attention and labor of men for the purpose of livelihood or profit. Flint v. Stone Tracy Co., 220 U.S. 107, 171 (1911). The term "trade or business" is not limited to the carrying on of ordinary industrial or commercial activities, but it includes the professions and the arts. Georges Simenon, 44 T.C. 820, 847 (1965). There are certain factors of evidentiary *133 importance which must be regarded in determining whether a taxpayer is engaged in a "trade or business" or "in carrying on a trade or business." Prominent among these features is the profit motive. See Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, wherein the Ninth Circuit stated: it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. Whether an enterprise in which a taxpayer is engaged constitutes a "trade or business" must be decided on the facts in each case. Georges Simenon, supra. Although a taxpayer need not have a reasonable expectation of earning a profit from a particular enterprise, nevertheless, under any definition, a business means a course of activities engaged in for profit. See Hirsch v. Commissioner, supra; Industrial Research Products, Inc., 40 T.C. 578, 590 (1963). Thus, a taxpayer must initiate or operate an enterprise with the good faith intention of making a profit or of producing income. [1]
*134 From her testimony, it appears that Lucile not only supplied the capital to finance the production of master records but also the very initiative and energy required to bring about their production. Lucile chose the songs to be recorded, the arranger for the songs chosen, the arrangement of the songs, and Linda's accompaniment. It appears that Linda only participated in the production of master records by vocalizing, in the manner determined by Lucile, the songs which Lucile selected. This modus operandi conforms to Lucile's belief that a vocalist was secondary in importance to the over-all "sound" of a popular song. She was convinced that the uniqueness of such "sound" rather than the vocalist caused popular records to be well received by the record-buying public. Despite these facts, the contract between Lucile and Linda provided that Lucile would receive only "5 per cent (5%) of [Artist's] [Linda's] gross earnings from any and all recordings paid for by Producer." We interpret this provision to mean that Lucile gave the master records which she produced to Linda. By implication, Linda would receive 95 percent of all gross earnings derived from the master records produced by *135 Lucile. We strongly suspect that Lucile's purpose in producing master records and promoting Linda was personal in nature and primarily for Linda's benefit; and, moreover, considering Lucile's capital expenditures in producing the master records involved herein which were given to Linda, she has not convinced us that she intended to profit from such activities. Since we are not at all convinced of Lucile's profit motive, we hold that she was not engaged in a trade or business for purposes of section 162 during the year 1960. Hirsch v. Commissioner, supra. Therefore, we sustain respondent's deficiency with respect to this issue. Since we have determined that Lucile was not engaged in a trade or business, we need not answer the second and third issues raised herein. The final issue for decision is whether petitioners are entitled to a deduction under section 165 of the 1954 Code for termite damage to their home. Section 165 provides, in part: (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case *136 of an individual, the deduction under subsection (a) shall be limited to - * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * Losses arising from termite damage have been held to be deductible as a casualty loss where the termite invasion and measurable damage have occurred within a relatively short period of time. Shopmaker v. United States, 119 F. Supp. 705 (E.D. Mo., 1953). Where losses due to termite damage do not occur suddenly or where there is a lack of demonstrated suddenness, such losses have been held to be nondeductible. Leslie C. Dodge, 25 T.C. 1022 (1956). Cf. E. G. Kilroe, 32 T.C. 1304 (1959). We do not believe that a loss deduction is allowable in this case. Leslie C. Dodge, supra. There is no evidence in the record whatsoever to show the proximity in time between the actual termite invasion and Lucile's discovery of the damaged wall. Although Lucile testified that petitioners' home was inspected yearly for termites, at another point she stated that there was no inspection of the premises between *137 the time when the original termite problem was discovered upon moving into their house after purchase and the time when the termites were seen swarming on a wall of the house. Nor do we have any evidence to show when petitioners purchased their house. Hence, the record affords no ground for ascertaining that the damage occurred within a relatively short time after the termite invasion. Thus, even under a liberal interpretation of the "suddenness" requirement, petitioners would not be allowed a loss deduction. Therefore, we hold for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. The likelihood of eventual profit is relevant in determining a taxpayer's good faith intention of making a profit. Lamont v. Commissioner, 339 F. 2d 377↩ (C.A. 2, 1964), affirming a Memorandum Opinion of this Court.