William A. Clementson and Elizabeth R. Clementson v. Commissioner.
Clementson v. Commissioner
Docket No. 4819-66.
United States Tax Court
T.C. Memo 1968-118; 1968 Tax Ct. Memo LEXIS 183; 27 T.C.M. (CCH) 559; T.C.M. (RIA) 68118; June 17, 1968, Filed William A. Clementson, pro se, 129 Valley Rd., Ardmore, Pa. Giles J. McCarthy, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies in the income tax of petitioners: Year
Petitioner
Deficiency
1959
William A. Clementson
$252.63
Elizabeth R. Clementson
410.56
1960
William A. Clementson
87.83
Elizabeth R. Clementson
351.78
1961
William A. and Elizabeth R. Clementson, jointly
571.01 The case involves four issues: deductibility of certain depreciation and repairs, deductibility of alleged business expenses, inclusion in income of certain rental payments, and deductibility of certain interest. Petitioners have conceded one further *185 issue. Findings of Fact The stipulation of facts filed by the parties together with accompanying exhibits is incorporated herein by this reference. Petitioners William A. Clementson (hereinafter sometimes referred to as William) and Elizabeth R. Clementson (hereinafter sometimes referred to as Elizabeth) are husband and wife, whose legal residence at the time of filing the petition in this case was Ardmore, Pennsylvania. In 1959, petitioners filed separate income tax returns with the district director of internal revenue at Pittsburgh, Pennsylvania. In 1960, William filed a separate income tax return with the district director of internal revenue at Philadelphia, Pennsylvania, and Elizabeth filed a separate income tax return with the district director of internal revenue at Pittsburgh. In 1961, petitioners filed a joint income tax return with the district director of internal revenue at Philadelphia. 1. Deduction for depreciation and repairs. Elizabeth's mother, Harrie Dilks Ransley, died testate on March 23, 1944. Her will provided in part: Fifth: I give and bequeath unto my daughter Elizabeth Ransley Clementson, all the rest, residue and remainder of my estate, real, personal *186 and mixed, for and during the whole term of her natural life. I order and direct that she keep the present stock investments as they are and use the income therefrom for her use and maintenance and the upkeep of the house 129 Valley Road, Ardmore, Pa.; but if she finds it necessary, she may rent this property either furnished or unfurnished, but she is not to sell it or encumber it by obligations of any kind * * *. The will contained further provisions concerning the discharge of the mortgage on 129 Valley Road, Ardmore, Pa. (hereinafter "the Ardmore property") and the payment of taxes and other charges against the Ardmore property. Elizabeth was appointed executrix under the will. On May 11, 1945, Orphans' Court of Montgomery County, Pennsylvania, construed the will to create a testamentary trust (hereinafter sometimes referred to as "the Ransley trust") with Elizabeth as life beneficiary and her four children as remaindermen. Included in the corpus of the trust was the Ardmore property. Elizabeth was trustee. On the following dates, the Orphans' Court granted Elizabeth's petitions for leave to invade corpus for the following purposes in the following amounts: Date
Purpose
Amount
9/18/52
Real estate taxes and repairs (incl. Ardmore property)
$2,929.00
2/16/53
Surety premiums; miscellan- eous
5,000.00
2/10/56
Real estate taxes (Ardmore property)
1,600.00
3/12/62
Repairs (Ardmore property); attorney's fees
3,456.52
*187 The Ardmore property was occupied by William and Elizabeth as their residence from June, 1958, to March, 1962, inclusive. The property had been previously rented. While residing at the Ardmore property during the years in issue, petitioners made various repairs on the house. It is stipulated that petitioners' legal residence at the time of filing the petition in this case (August 26, 1966) and at the time of the stipulation was the Ardmore property. The property was rented in the summer of 1967. In the separate returns filed by Elizabeth for 1959 and 1960, and in the joint return of petitioners for 1961, the following deductions relating to the Ardmore property were claimed: Year
Repairs
Depreciation
Total
1959
$ 928.54
$500.00
$1,428.54
1960
1,153.22
500.00
1,653.22
1961
355.00
542.50
897.50 561 These deductions were disallowed in their entirety by the Commissioner in his notices of deficiency. 2. Deduction for business expenses. William is a graduate of Harvard College and Harvard Graduate School of Business Administration; he is a certified public accountant and a former internal revenue agent. From 1952 to April 15, 1960, inclusive, *188 William was supervising auditor with the Auditor General's Department of the Commonwealth of Pennsylvania in Harrisburg, Pennsylvania. William worked at this job from 8:30 a. m. to 5:00 p. m. Monday through Friday. During the years at issue, petitioners resided at the Ardmore property, located in a suburb of Philadelphia. During 1959 and until April 16, 1960, William drove each work day in his privately owned car from his residence in Ardmore to his job in Harrisburg, a distance of 95 miles, and returned to Ardmore in the evening. The total mileage traveled was 42,750 miles in 1959 and 14,000 miles in 1960. In 1937, William's grandmother, Ida J. Kinsell, died. Under her will, William and his brother obtained a fee simple interest, subject to two life estates which expired in 1940 and 1960, respectively, in a piece of real estate located in Marchand, Indiana County, Pennsylvania (hereinafter "the Marchand property"). William was appointed administrator of the estate in 1937. He received no compensation for his services as administrator. The Marchand property, located 275 miles from Ardmore, and 180 miles from Harrisburg, consists of 50 acres of land and a six-room frame house with *189 no plumbing or running water. The property has never been rented because of the lack of plumbing and water; the land has not been farmed since 1925; no income has been derived from the property since 1950 when timber was cut and sold. In the years at issue, William made the following round trips from the Ardmore property to the Marchand property in his privately owned automobile: Year
Round Trips
Total Mileage
1959
6
3,300
1960
3
1,650
1961
1
550 In the years in issue, William paid all real estate taxes on the Marchand property and in 1961 repaired the roof and windows of the house located on the Marchand property. During the years in issue, William reported the following gross earnings, consisting solely of wages: Year
Employer
Wages
1959
Auditor General's Department, Commonwealth of Pennsylvania, Harrisburg, Penna.
$4,379.95
1960
Auditor General's Department, Commonwealth of Pennsylvania, Harrisburg, Penna.
1,361.10
Korvette Stores, Philadelphia, Penna. 97.65
Total for 1960 $1,458.75
1961
Wolfe & Company Philadelphia, Penna.
$1,062.01
E. J. Bettinger's Employment Service, Philadelphia, Penna 187.00
Total for 1961 $1,249.01
*190 In none of the above jobs was William required to incur unreimbursed travel or other expenses. During the years in issue, William maintained no private office for the practice of accounting, nor did he hold himself out to the public as a certified public accountant in private practice. William assisted his wife in the administration of the Ransley trust, but received no compensation therefor. He prepared a schedule of the assets of the trust and attended from three to twelve conferences per year with Elizabeth and William E. Huganir, an attorney, in Norristown, Pennsylvania, approximately seven miles from Ardmore. The conferences were each of approximately thirty minutes' duration and, while William worked in Harrisburg, were held either on weekends or on weekdays during William's annual leave. Conferences were also held with the judge of the Orphans' Court of Montgomery County in order to determine whether certain trust securities could be sold. William also painted the house located on the Ardmore property and performed minor repairs thereon. On his separate returns for 1959 and 1960 and on his joint return in 1961, William filed separate Schedules C, giving as his principal *191 business activity "Accountant-Trustee (CPA)." On these schedules, he reported no income, but claimed the following business deductions: 1959
1960
1961
Losses on business property
$ 61.00
Depreciation
738.00
$487.50
$ 688.50
Other business ex- penses
600.95
508.12
567.66
Repairs
10.00
90.00
Insurance
20.00
Legal fees
10.00
$1,409.95
$995.62
$1,376.16 562 The depreciation deducted in each year consisted of 75 percent of the total yearly depreciation of two automobiles. The "other business expenses" deducted in each year were explained on the returns as follows: 1959:
57 Volkswagen
$384.00
57 Saab
60.35
Gasoline 357.00
1,728 Gals. of Gasoline at 20 cents net)
801.35 X.75 = 600.95
1960:
Volkswagen
87.50
'57 Saab (includes straightening top not com- pensated for by insurance)
430.00
800 gallons of gasoline at 20 cents net 160.00
677.50 X.75 = 508.12
1961:
1957 Saab
[Rewiring, new shocks]
185.50
[Continental Imports] Door-Vetterlein
25.00
Miscellaneous
75.00
1959 Simca
Transmission - Koegler
181.33
New Top
50.00
Misc. repairs 80.00
(These repairs not compensated for by insurance) $596.83
Total car repairs
596.86
800 gallons of gasoline at 20 cents per gallon, net 160.00
Other expense
$567.66
*192 Percentage allowable 756.83 X.75 = $567.66 The $90 deduction for "repairs" in the 1961 return is accompanied by a note stating "trip to repair roof." On page one of the 1961 Schedule C is a footnote "A" stating "Includes Hotel Expenses," but there appears to be no referent for this footnote. At the bottom of page two of the 1961 Schedule C is the statement "E. The property in question is 50 acres of land, not now farmed, with a small wood lot, orchard and house." Of the claimed business deductions, the Commissioner disallowed the following amounts: 1959
$1,030.75
1960
505.07
1961
1,234.11
The disallowance of these amounts was based upon both lack of substantiation as well as failure to establish that the expenses were otherwise properly deductible as business expenses. It is not clear upon what ground the Commissioner allowed the remaining expenses claimed, except that, as to 1960, his determination shows that the amount allowed was in greater part attributable to an automobile casualty loss in the amount of $430. 3. Inclusion of rental income. On September 16, 1955, petitioners entered into a contract to purchase a house and lot located in Hampden Township, *193 Cumberland County, Pennsylvania, (hereinafter referred to as "the Camp Hill property") from William and Helen Ziegler. The Zieglers advanced to petitioners $1,900 for a down payment. The contract provided for a purchase price of $11,500, to be paid as follows: $85 per month for 12 months beginning in September, 1955; $100 per month for 12 months beginning in September, 1956; and $115 per month thereafter, beginning in September, 1957. Of each payment, $58.65 was to be paid on the outstanding mortgage on the property. Payments were to continue until, excluding the mortgage payments, $1,900 plus six percent annual interest, computed semi-annually, had been paid to the Zieglers. At that point, petitioners were to receive a deed and assume the remaining mortgage. Prior to the full payment of the $1,900 debt and the delivery of the deed the parties treated that debt as though the sellers had taken back a $1,900 purchase money second mortgage on the property. Petitioners agreed to pay taxes on the property and to insure it from and after September 16, 1955. On March 22, 1962, the Zieglers conveyed the Camp Hill property to petitioners by deed. In the years at issue the Camp Hill property *194 was rented with the Ziegler Realty Company as broker. Ziegler Realty Company received five percent of gross rentals for collection of rent. Rent from the Camp Hill property was paid directly to the Zieglers and was applied against the purchase price of the property according to the terms of the contract. In the years at issue neither petitioner reported any income from the rental of the Camp Hill property. In his 1959 return, William claimed a loss of $76 from the Camp Hill property, representing the cost of painting on the property. The parties have stipulated that in the years in issue, the respondent determined that the petitioners received the following net income from rental of the Camp Hill property: 563 1959
1960
1961
William
$82.48
$278.55
Elizabeth
82.48
278.55
Petitioners jointly
$164.96 [1] The net income was computed as follows: 1959
1960
1961
Gross rental income
$1,080.00
$975.00
$1,080.00
Expenses:
Collection fees
40.50
107.25
40.50
Repairs
138.00
53.47
138.00
Utilities
12.73
Taxes
88.20
88.20
Interest
403.89
403.89
Depreciation 244.45
244.45
244.25
Net Income
$164.96
$557.10
$164.96
*195 4. Deduction for interest. In her return for 1959, Elizabeth deducted $460 for interest paid to "Wm. Ziegler." This deduction was disallowed by the Commissioner. In 1959 petitioners' payments on the first mortgage on the Camp Hill property included interest payments of $403.89. This interest payment was taken into consideration by the Commissioner in computing the net income from the Camp Hill property. For the period of September 1, 1958, to April 1, 1960, petitioners paid as interest on the $1,900 note held by the Zieglers a total of $51.03. The portion of this amount paid in 1959 is $32. Opinion RAUM, Judge: At the outset it should be noted that petitioners were not represented by counsel, but appeared at trial and prepared their own briefs. William conducted the trial on their behalf. He chose not to testify and called Elizabeth as their only witness. She gave no testimony of consequence in respect of most of the facts necessary to support petitioners' positions. In their briefs, petitioners rely on and appear to assume as established many facts supporting their position, but which are not properly in evidence before us. We may, of course, take into account only those facts *196 properly in evidence, and to the extent that petitioners have failed to carry their burden of proof decision must go against them. 1. Deductibility of depreciation and repairs. Elizabeth was trustee of her mother's testamentary trust and was life beneficiary of the Ardmore property, a trust asset. The property was used by petitioners as a personal residence from June, 1958, through March, 1962. It had previously been rented, and was subsequently rented in the summer of 1967. While occupying the premises, petitioners made various repairs on the house. There is a suggestion that such repairs were made in order to put it in shape to rent, but in view of petitioners' occupancy of the property and the long lapse of time prior to the rental in the summer of 1967 we are far from persuaded that the repairs were made for that purpose. No evidence was introduced to show whether the property was listed for rental during the years at issue or whether it was listed for rent or in fact rented after March, 1962, except for the summer of 1967. It should also be noted that petitioners gave the address of the Ardmore property as their legal residence in their petition filed herein in August, 1966 *197 and in the stipulation. The Commissioner disallowed in their entirety deductions taken for depreciation and repairs in respect of the Ardmore property in each of the years in issue. He makes no contention that, should these deductions be found proper, Elizabeth is not the proper person to take the deductions. See section 167(h), I.R.C. 1954. Petitioners' primary contention is that the property was "held for the production of income" within the meaning of sections 167(a)(2) and 212(2). We disagree. The general rule is that depreciation and maintenance expenses in respect of the taxpayer's residence are not deductible. Sections 1.167(a)-2 and 1.212-1(h), Income Tax Regs.A personal residence, however, may be converted into property held for the production of income if the property is abandoned as a residence and held out for rental even though no income is in fact realized from the property and even though the property is at the same time offered for sale. See William C. Horrmann, 17 T.C. 903, 908; *198 Mary Laughlin Robinson, 2 T.C. 305, 307-309. See also, section 1.212-1(h), Income Tax Regs. However, in no case called to our attention has property used solely as the taxpayer's residence been found to be property "held for the production of income." In Ebb James Ford, Jr., 29 T.C. 499, the taxpayer purchased property and occupied it with his family for three months following the purchase, at the same time listing it for rental. This Court denied a depreciation deduction for these three months. In the present case, there is not even any evidence that the Ardmore property was listed for rent during the years at issue. 564 During these years, the property was not held for the production of income, and the deductions taken by petitioners were properly disallowed as personal expenses. Section 262. The fact that the property may have been held for rental in years before petitioners' occupancy is not controlling here with regard to its character during such occupancy. Nor does the fact that legal title was in the Ransley trust have any bearing on the case. Petitioners' alternative argument is that the deductions are justified *199 under section 119 on the theory that the Ransley trust was an employer, that Elizabeth was an employee of the trust, and that her living on the Ardmore property was required as a condition of employment. Apart from other possible grounds for the inapplicability of section 119, it is clear that the trust did not require Elizabeth to live on the premises. There is no merit to the point. 2. Deductibility of business expenses. William reported business losses on Schedule C in each taxable year, giving as his principal business activity "Accountant-Trustee (CPA)." No gross income was reported from this claimed business activity in any of the taxable years, and nearly all the deductions giving rise to the claimed business losses appear to represent 75 percent of William's total automobile expense. The Commissioner disallowed portions of the deductions as follows: Claimed
Disallowed
1959
$1,409.95
$1,030.75
1960
995.62
505.07
1961
1,376.16
1,234.11
We find that petitioners have not sustained their burden of showing the Commissioner's determination to be erroneous. William's use of Schedule C in reporting these deductions implies a reliance on section 162(a), 1954 I.R.C. *200 , and in their briefs petitioners offer section 212 as an alternative basis for the deductions. Section 162(a) provides in relevant part: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (2) traveling expenses * * * while away from home in the pursuit of a trade or business; * * * Petitioners contend that Williams' travel between his residence at the Ardmore property and his job in Harrisburg in 1959 and 1960, his travel between his residence and the Marchand property in each of the taxable years, and his travel in accompanying Elizabeth to conferences concerning the trust were in connection with his trade or business of "Accountant-Trustee (CPA)." [2] With regard to the travel between Ardmore and Harrisburg, petitioners appear to recognize that commuting expenses are not deductible, but rather argue that William's *201 connection with the trust was a trade or business, so that the travel was between two jobs. The primary flaw in petitioners' argument is their contention that William was engaged in a trade or business other than that of employee. William was not formally a trustee of the trust, as was Elizabeth, and he received no compensation for his services performed for the trust. He received no compensation during the years at issue for the administration of his grandmother's estate. [3] There is no evidence that the Marchand property was held for income producing purposes, and no income had been derived therefrom since 1950. William did not hold himself out to the public as a certified public accountant in private practice and maintained no office for the practice of accounting. *202 William lacked the requisite profit motive in his activities to qualify as engaged in a trade or business. As the court said in Hirsch v. Commissioner, 315 F. 2d 731, 736 (C.A. 9): From the very import of Section, which presupposes that the taxpayer has received taxable income before deductions can be taken therefrom, it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. While the expectation of 565 the taxpayer need not be reasonable, and immediate profit from the business is not necessary, nevertheless, the basic and dominant intent behind the taxpayer's activities, out of which the claimed expenses or debts were incurred, must be ultimately to make a profit or income from those very same activities. Doggett v. Burnet, 62 App. D.C. 103, 65 F. 2d 191 (1933); C.I.R. v. Widener, 33 F. 2d 833 (3d Cir., 1929); Coffey v. C.I.R., 141 F. 2d 204 (5th Cir., 1944); Morton v C.I.R., 174 F. 2d 302 (2d Cir. *203 , 1949; Brooks v. C.I.R., supra; Trent v. C.I.R., 291 F. 2d 669 (2d Cir., 1961). While some of William's travel expenses may have benefited the trust, they were not attributable to any trade or business of William's. Any argument under section 212[4] must fail for essentially the same reasons. William himself derived no income from his activities related to the Ransley trust, and he may not deduct expenses incurred to protect the income-producing property of another. Herbert Marshall, 5 T.C. 1032. As stated above, there is no evidence that the Marchand property was held for the production of income. While section 1.212-1(b), Income Tax Regs., states that Expenses paid or incurred in managing, conserving, or maintaining property held for investment may be deductible under section 212 even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will otherwise be productive of income *204 * * *, there is no evidence that the Marchand property was "held for investment", as distinguished from personal purposes. Finally, there is no clear evidence as to the purpose of the trips to the Marchand property; some or all may have been for purely personal purposes. Even were we to find that the Marchand property was held for investment, we cannot find that travel to the property in connection with its investment character gave rise to deductions any larger than those allowed by the Commissioner in each taxable year. 3. Inclusion of rental income. In September, 1955, petitioners entered into a contract to purchase the Camp Hill property. Monthly payments to the seller were to include an amount to discharge an existing mortgage *205 and an amount to repay, with interest, $1,900 loaned to petitioners by the sellers for a down payment. During the years at issue, the property was rented, and the rent was paid directly by the tenant to the sellers. The payments were used to discharge petitioners' obligations in respect of the monthly payments under the contract of sale as described above, plus a collection fee. Petitioners included none of these amounts in income. The Commissioner, taking into account certain allowable deductions, included in petitioners' taxable income the net income from the Camp Hill property. The Commissioner's inclusion of these amounts was correct. It is elementary that, in the absence of a gift, a taxpayer receives income when his debt or obligation is satisfied by another. Old Colony Trust Co. v. Commissione, 279 U.S. 716, 729. Here petitioners' obligation to the sellers of the Camp Hill property was reduced by the tenant's payment. There is no evidence that either the tenant or the sellers were making a gift to petitioners. That petitioners never received physical possession of the *206 money and that the rental agreement may have been directly between the seller and the tenant are immaterial, for the rental payments were applied to petitioners' benefit. Petitioners claim that in some sense the result should be different because the transaction was not "closed" in that they would not receive clear title to the property until a certain amount had been paid. We fail to see how this changes the fact that the payments benefited petitioners. 4. Deductibility of interest expense. In her return for 1959, Elizabeth deducted $460 for interest paid to "Wm. Ziegler." The Commissioner disallowed the entire amount. It is apparent that this figure represented the total of the interest paid on the first mortgage on the Camp Hill property and the interest paid on the $1,900 note held by the Zieglers. The interest paid on the first mortgage amounted to $403.89 and was 566 applied by the Commissioner against gross rentals in determining the net receipts from the Camp Hill property. Petitioners also paid $51.03 as interest on the $1,900 in respect of the period September 1, 1958, and April 1, 1960. While we have no evidence as to how much of this amount was actually paid in *207 1959, we think that some was, and have estimated this amount to be $32. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2). This amount was improperly disallowed as a deduction. *tDecision will be entered under Rule 50. Footnotes
1. This stipulation appears, at least superficially, to be at variance with the deficiency notice itself as to the year 1961, where the 1961 net income from rents from this property was shown to be $530.58.↩
2. No evidence was presented to show that any part of the claimed expenses related to travel to the Camp Hill property.↩
3. Even had William been a trustee of the Ransley trust and received compensation therefrom as well as from his grandmother's estate, such activities would not constitute a "trade or business." Frederic A. Seidler, 18 T.C. 256, 259; Est. of Hyman Y. Josephs, 12 T.C. 1069. Cf. Rev. Rul. 58-5, 1958-1 C.B. 322↩.
4. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *↩