BENNETT I. and BETTE W. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 6736-74.
United States Tax Court
T.C. Memo 1975-361; 1975 Tax Ct. Memo LEXIS 13; 34 T.C.M. (CCH) 1562; T.C.M. (RIA) 750361; December 22, 1975, Filed Bennett I. Miller, pro se. Douglas R. Fortney, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1971 in the amount of $3,957.72. The sole issue for decision *14 is whether losses sustained by petitioners in 1971 as a result of advances to, or payments on behalf of, a corporation organized by petitioner Bennett I. Miller are deductible as business bad debt losses under section 166(a)[1]/ or nonbusiness bad debt losses under section 166(d). FINDINGS OF FACT Petitioners, Bennett I. and Bette W. Miller, husband and wife, were legal residents of Dallas, Texas, when their petition was filed. Prior to 1968 petitioner Bennett I. Miller (hereinafter Miller) was engaged in the business of garment manufacturing. In 1968, Miller decided to dedicate the ensuing several years of his life to social service. He intended to apply the managerial skills developed from his experience in the garment business to work designed to alleviate the problems of hard core unemployment, e.g., management training of the unemployed. As a vehicle for management training, Miller incorporated Superior Service Systems, Inc. (hereinafter Superior), under the laws of the State of Texas on August 29, 1969. By organizing Superior, *15 Miller intended to involve economically and socially deprived individuals in the business of cleaning services and peripheral enterprises such as food service, laundry service, and transportation service. On September 18, 1969, Miller paid to the corporation $1,000 for 1,000 shares of stock, which constituted all of the stock issued by Superior. He immediately sold 250 shares to each of three individuals for $1.00 per share so that thereafter Miller owned 25 percent of the outstanding stock of Superior. Each of the three stock purchasers gave Miller a non-interest-bearing note for their stock. No payments were ever collected on these notes. On that same date, an organizational meeting was held by the Board of Directors to authorize Superior to borrow $12,000 from Miller. On October 1, 1969, Miller loaned the corporation $12,000 and received a promissory note bearing interest at the rate of 6 percent per annum. After an initial payment of interest only on October 1, 1970, the note was to be repaid in four annual installments commencing on October 1, 1971. On October 28, 1969, Miller subordinated his note to a $24,000 loan to Superior from the First National Bank of Dallas. The *16 latter note, bearing interest at the rate of 9-1/2 percent per annum and payable over 5 years, was guaranteed by the Small Business Administration. This debt was also guaranteed by Miller to the extent of 25 percent. The other three shareholders agreed to be jointly and severally liable for the remaining 75 percent of the loan. Miller and the other three shareholders each received a salary from Superior, payable at the rate of $6,000 per year. During the period October 1969 to January 31, 1970, Miller was a salaried employee and the manager of Superior. On February 1, 1970, Miller became chairman of the Dallas Community Action Committee. Thereafter, management of Superior was left largely to its employees. In August 1970, Superior went out of business, and its assets were taken over by the Small Business Administration. The stock of Superior became wholly worthless in 1971. In addition to the $1,000 invested in Superior's stock and the initial loan of $12,000, Miller paid other expenses on behalf of the corporation. These expenses included: $6,350.00 to the Small Business Administration for the portion of the note he guaranteed; $4,478.28 to the Internal Revenue Service for employment *17 taxes; and, $537.87 for insurance premiums owed by the corporation. Miller loaned an additional $2,000 to Superior on June 30, 1970. The total amount of the advances made by Miller to or on behalf of Superior is $28,181.38, including the $1,000 paid for the stock. Miller did not expect to derive a financial profit from the loans and activities with respect to Superior. Rather, he was motivated primarily by the rewards society as a whole would reap from the economic and social advancement of the underpriviledged. Petitioners filed a joint Federal income tax return for 1971 on which they treated the advances to Superior as losses resulting from the worthlessness of section 1244 stock and deducted the entire amount as an ordinary loss. Respondent disallowed the deduction of all but $1,000 of this amount and treated $27,181.38 as short-term capital losses resulting from nonbusiness bad debt losses under section 166(d). ULTIMATE FINDING OF FACT The losses sustained by Miller were not incurred in connection with a trade or business. OPINION Petitioners have abandoned the claim to a deduction under section 1244, and now contend that their losses in dealing with Superior are allowable *18 as business bad debts. Section 166(a) provides a deduction for the full amount of any debt which becomes worthless during the taxable year, but section 166(d) renders that provision inapplicable to nonbusiness bad debts. Section 166(d)(2) defines a nonbusiness debt to mean a debt other than-- (A) A debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Losses attributable to nonbusiness debts are accorded the same treatment as losses on the sale or exchange of a capital asset held for not more than 6 months. Under section 166, the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears a proximate relationship to the taxpayer's trade or business will it qualify for business bad debt treatment under section 166(a). Whipple v. Commissioner,373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs.
In order to prevail, *19 petitioners must, therefore, demonstrate that the disputed indebtedness arose in the context of a "trade or business" within the meaning of section 166(d). According to petitioners, the loans and other payments to Superior were part and parcel of the trade or business of promoting entrepreneurial efforts by minority groups. An integral part of that trade or business, the argument goes, is the raising of capital funds. Thus, the loans and guarantees were proximately related to Miller's trade or business. Petitioners' argument is innovative, but we are compelled by the decided cases to find it without legal merit. For the activities conducted by Miller to qualify as a "trade or business," they must have been prompted by a bona fide profit motive. Porter v. Commissioner,437 F.2d 39, 40 (2d Cir. 1970), affg. a Memorandum Opinion of this Court; Lamont v. Commissioner,339 F.2d 377, 380 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Margit Sigray Bessenyey,45 T.C. 261, 273-274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), *20 cert. denied 389 U.S. 931 (1967). The standard for deciding whether a taxpayer's activities constitute a "trade or business" was stated in Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court, as follows: * * * it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. While the expectation of the taxpayer need not be reasonable, and immediate profit from the business is not necessary, nevertheless, the basic and dominant intent behind the taxpayer's activities, out of which the claimed expenses or debts were incurred, must be ultimately to make a profit or income from those very same activities. * * * Absent that basic and dominant motive, the taxpayer's activities, no matter how intensive, extensive or expensive, have not been construed by the Courts as carrying on a trade or business * * * The issue is factual, and the ultimate finding depends upon all the facts and circumstances of each case. *21 Morton v. Commissioner,174 F.2d 302, 303 (2d Cir. 1949), affg. a Memorandum Opinion of this Court, cert. denied 338 U.S. 828 (1949). By his own admission, Miller did not undertake the incorporation of Superior and the subsequent advances thereto for financial profit. [2]/ Rather, his return was to be in the form of "socially desirable rewards." While Miller's endeavors may have benefitted the community in which he lived, such a return, unfortunately, is not the kind of profit which is a prerequisite for the deduction of his losses. To the extent Miller expected to earn interest on the indebtedness or to enhance the value of his equity interest in the corporation through his efforts, he was proceeding as an investor and was not engaged in an independent trade or business. See United States v. Generes,405 U.S. 93, 103 (1972); Whipple v. Commissioner,supra at 202-203; *22 Phil L. Hudson,31 T.C. 574 (1958). Petitioners concede as much, as well as the fact that the advances bore no relation to Miller's trade as an employee of the corporation. See e.g., United States v. Generes,supra;Trent v. Commissioner,291 F.2d 669, 670-671 (2d Cir. 1961), revg. 34 T.C. 910 (1960). Nor do petitioners contend, and the record would not support the conclusion, that Miller was in the business of money lending. In short, we are unable to find any profit-motivated trade or business to which the controverted indebtedness was proximately related. During the year in issue, Miller no doubt actively contributed to economic and social progress within his community. His laudable efforts in that regard deserve the respect of this Court and the gratitude of the people in his community. In deciding the controverted issue, however, we are constrained by our duty to interpret the law as written, and the facts established by the trial record compel us to uphold respondent's determination that Miller's losses are not deductible. Decision will be entered for the respondent.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect for the year in issue, unless otherwise noted.
2. /↩ Miller testified that his "dominant motive was making an effort towards producing assistance to the economically and culturally disadvantaged, and that was only possible through the use of this particular loan and other financial assistance that I provided."