Clement L. HIRSCH, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17779.

United States Court of Appeals Ninth Circuit.

March 22, 1963.

Shearer & Fields, Jacob Shearer and Bernard Shearer, Beverly Hills, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Robert L. Walters, Meyer Rothwacks, Gilbert E. Andrews, and Earl J. Silbert, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before JERTBERG and BROWNING, Circuit Judges, and PENCE, District Judge.

PENCE, District Judge.

This is another tax case involving the question of whether the Tax Court correctly held that the petitioner-appellant (taxpayer) was not entitled to deduct from his federal income taxes certain expenses paid and a worthless debt suffered by him, as not having been incurred in the taxpayer's trade or business.

Such facts as found by the Tax Court which we deem here pertinent may be summarized as follows:

The Las Vegas Thoroughbred Racing Association, organized to build a race-track in Las Vegas, Nevada, was finan-

cially unsuccessful and became the subject of a bankruptcy proceeding. As part of a plan of reorganization, the Las Vegas Jockey Club was incorporated in March 1953. Under the plan, the Jockey Club issued $2,000,000 of 6 per cent mortgage bonds and $42,500 par value Class A stock. Holdings of bonds and Class A stock were proportionate, with one thousand shares of $0.02 par value stock held for each $1,000 in bonds. In addition, Class B stock was issued to a minority group, consisting of preferred stockholders and bondholders of Jockey Club's predecessor, the Las Vegas Thoroughbred Association. Taxpayer invested about $90,000 in par value Jockey Club mortgage bonds and the accompanying Class A stock.

The (so-called Luke-Smith) plan of reorganization contemplated that the funds would be used to purchase the real property of Thoroughbred Racing Association, to furnish money for amounts due to the United States, the State of Nevada, and other government agencies and creditors, to pay for costs of administration of the proceeding, to complete the racing plant, and to provide sufficient capital for operating expenses.[1] The plan was confirmed by the District Court in February 1953.

The board of directors of Jockey Club consisted of fifteen members, including Clement Hirsch (taxpayer), Louis Smith and Raymond Roberts. Three of the members of the board, including Roberts (and Ernest Cragin), represented the holders of Class B stock. A five-member executive committee of Jockey Club, which included Hirsch, Smith (Smith's attorney, Kenneth Graf; Ernest Cragin, representing the Class B stockholders; and Arthur Brick), carried on the day-to-day operation of the Club. Smith was elected president, and Hirsch vice-president of the Jockey Club in March 1953.

On May 12, 1953, a petition for an order to show cause in the Thoroughbred Association proceedings was filed in the District Court by Roberts, in which taxpayer and all other officers and members of the executive committee were charged with mismanagement of the affairs of Jockey Club.[2] The petition charged, among other things, that Jockey Club funds had been channelled into overconstruction of the plant improvements and that funds for operating capital had been depleted. In connection with these charges, Roberts asserted that the court should consider whether the Jockey Club had and should bring a cause of action against its officers and the members of the executive committee by reason of the asserted mismanagement. Hearings on this petition were held before a Special Master in May and June of 1953.[3]

---

1. The Luke-Smith plan provided in its budget for a reserve fund of $100,000 for pre-opening and operating expenses, and that a Turf Club (clubhouse) would not be built unless additional financing was first obtained.

2. Although this was a Tax Court finding, the Tax Court itself observed that the parties stipulated to some dates and facts which the record did not support. This stipulated "fact" is apparently an error. Taxpayer's Exhibit #1 is a copy of the October 15, 1953 order to show cause filed by Roberts and contains Roberts' affidavit in support of his petition. Roberts states therein that the May 12, 1953 order was filed by the Special Master, on a sua sponte motion, to enquire into the pre-opening and operating reserve fund of $100,000, the budget, contracts of the Jockey Club, and special financing.

No charges were made by Roberts in the May 12 order to show cause. Roberts made his charges against the executive committee in his October 15, 1953 petition for an order.

The errors in "facts" apparently arose, in part, out of the stale memories of Hirsch and Smith in their 1961 testimony concerning 1953 occurrences.

3. In Roberts' Affidavit for his October 15, 1953 petition for a show cause order he affirms that in the hearings before the Special Master in June 1953, the essence of the representation made by Hirsch and Graf were to the effect that after the buildings had been completed, there would be sufficient reserve on hand to take care of the normal operating expenses and the contemplated initial loss usually concurrent with the opening of a race track; further that if more

Hirsch was told by Smith and by attorney Graf, that if money were not raised to provide operating capital, the members of the executive committee would be subject to liability for mismanagement. Smith requested all Jockey Club bondholders to advance to the Club an amount of money equal to 20 per cent of their bond holdings. Not all bondholders so advanced the money, and some, including Smith and taxpayer, furnished more than 20 per cent. Smith advanced $60,000 and taxpayer $20,000. Graf advanced no money. The $316,200 advanced provided needed funds to permit the Jockey Club to open its racing meeting about Labor Day, 1953.[4]

As a result of poor attendance and the receipt of insufficient funds from parimutuels, the Jockey Club cancelled the racing meeting prior to completing the full schedule. Several weeks later a second attempt was made to open the track on a more modest scale.[5] This also failed after several days, and no further racing was conducted.

On October 15, 1953, a petition for an order to show cause was filed by Roberts in the Thoroughbred Association proceeding in the District Court. The petition alleged substantially the same matters which the May petition had contained, but was directed against the executive committee and all directors (thus including Roberts himself). On October 19, 1953, the District Court, in the matter of the Thoroughbred Association, issued an order to show cause why the directors should not be removed, why an operating receiver should not be appointed, (etc.). The order directed that a hearing be held on November 2, 1953, and also directed the Jockey Club to show cause why the trustee should not be empowered and directed to investigate the possibility of civil causes of action against the executive committee. After hearings running into February 1954, the Jockey Club filed a voluntary petition in bankruptcy in the District Court on February 19, 1954.

Hirsch traveled to and from Las Vegas during 1953 in connection with his activities in the Jockey Club.

In 1953, Hirsch paid a Reno, Nevada, law firm $1,000 to represent him and others in connection with the hearings on the order to show cause directed to him and to others on October 19, 1953.[6]

stables were to be built, the bondholders would arrange for such financing without prejudice to the rights of Class B stockholders.

4. Hirsch's contention that he did not put up the $20,000 to protect his investment, but rather because of threats of litigation against him as a member of the executive committee, for the claimed illegal acts of that committee, is contradicted by other substantial evidence.

In addition to the representation made by Hirsch to the Special Master as set out in Note 3, the record shows that by August, as Smith repeatedly testified, the corporation had run into a lot of difficulties and "it cost more." The corporation was short of money; creditors were pressing for payment. So, "I [Smith] said to [the bondholders]: 'Look, these bills have got to be paid, and we have got to get the money.'" "The only people that put up their money, they put it up because I put mine up. They went along with me."

In his affidavit (Cf. Note 3) Roberts corroborated Smith on the financial condition of the Club before the September opening.

Of special note is the fact that neither Graf nor Cragin, both members of the executive committee, put up any money.

5. Hirsch acted as track operator of this second racing meeting.

6. This finding of the Tax Court, although based on stipulation, was apparently not correct. (Cf. Note 2.) Contained in taxpayer's Exhibit #6 was his check, dated June 28, 1953, for $1,000, made out to Kenneth Graf, payee, endorsed by Graf to his firm McLane, Davis, Carleton & Graf, and deposited by that firm in their trust account in the Manchester National Bank, Manchester, New Hampshire. Hirsch's notation on this check is: "For Payment of attorneys in race track case". This payment could only have referred to the services rendered in connection with the May-June show cause hearings. Obviously the October 19 show cause could not have been anticipated since it was undoubtedly expected that the first racing meeting, starting on Labor Day, would be successful.

Apart from the above specific findings of the Tax Court, the record shows that Hirsch in 1953 received no compensation from Jockey Club, and when the latter subsequently became bankrupt, Hirsch did not file a claim for salary. His 1953 tax return reported income from the Victory Packing Company (of which he was the president) in the amount of $54,936.31, and income from Dog Town Packing Company ( a partnership in which he was a partner) in the amount of $27,674.

Hirsch testified that when he first became a member of the executive committee, on a couple of occasions it was discussed that, when the track was successful, the members of the executive committee would be paid, and that whoever was on the spot operating the track would likewise be paid. His testimony concerning his operation of the track for the second racing meeting was that the Jockey Club had agreed to reimburse him all of his expenses, and if he continued to operate the track he was to receive a salary.[7] The Jockey Club actually paid $1,244.14 of his expenses. He did not, however, receive any pay for any of his services. Under cross-examination he stated that his position as president of the Victory Packing Company was a "full time job", but he also testified that during the period from March through December, 1953, he was in Las Vegas half of that time because he was in charge of operations of the Jockey Club. He also went to Reno twice, once on a show cause order and once because Judge Foley wanted to see him about the way the track was being operated.

Hirsch's statements regarding the time spent in Las Vegas were corroborated by checks and hotel bills showing that, except for the month of August, he was in that city at some time during each month from March through December.

The record also shows that of the members of the executive committee, only Hirsch and attorney Graf testified before the Special Master in response to the May 15 order to show cause concerning the proposed budget and further financing, and that at a meeting of the directors on October 6, 1953, it was stated by president Smith that Hirsch had assumed the duties of "executive chief" of the Jockey Club.

In his 1953 income tax return, Hirsch deducted the $20,000 he advanced to the Jockey Club as a business bad debt. He also deducted as travel and entertainment expenses $2,869.89, a sum he claimed to have spent while in Las Vegas and traveling between Las Vegas and his California residence, all as ordinary and necessary business expenses incurred in connection with his activities in the Jockey Club. He also deducted as a business expense the $1,000 legal fee above referred to.

The Commissioner of Internal Revenue disallowed each of these deductions and determined a deficiency in income tax in the amount of $17,092.12. The Tax Court upheld the deficiency as determined by the Commissioner, ruling that while the $20,000 was a loan to the Jockey Club, taxpayer failed to show that his activities as an officer, director and executive member of the Jockey Club, out of which his expenses and bad debt were claimed to have flowed, constituted carrying on a "trade or business", within Section 23 of the Internal Revenue Code of 1939 (as amended by Secs. 121(a) and 124(a), Revenue Act of 1942, c. 619, 56 Stat. 798), Deductions from Gross Income. The Tax Court consequently found it unnecessary to rule upon the Commissioner's contention that the debt had not become worthless in 1953. From the decision of the Tax Court, taxpayer has prosecuted the instant appeal.

The wording of Section 23, by its deceptive simplicity, has spawned a multitude of decisions and opinions, each stemming from the problem of whether

7. A Mr. Webb Everett, a "very fine man in racing", had been hired away from Santa Anita, at a very high salary, to act as track operator for the first racing meeting.

or not the deductions claimed were incurred in the taxpayer's trade or business, a status which, as Treasury Regulations 118 (1939 Code) referring to this Section state "is a question of fact in each particular case." [8]

The concluding words of Mr. Justice Cardozo in Welch v. Helvering, 290 U.S. 111, 116, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1953) equally apply to the problem here: "Many cases in the federal courts deal with phases of the problem in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with borderline conclusions."

■■ "[A]ll expenses of every business transaction are not deductible. Only those are deductible which relate to carrying on a business." Higgins v. Commissioner, 312 U.S. 212, 217, 61 S.Ct. 475, 477, 85 L.Ed. 783. The spending of time, money and effort as a corporate executive or in any activity or venture in the general realm of business, however, does not per se put a taxpayer in "business" within Section 23. From the early case of Wilson v. Eisner, 282 F. 38 (2d Cir., 1922) through Brooks v. C. I. R., 274 F.2d 96 (9th Cir., 1959) and Wright v. Hartsell, 305 F.2d 221 (9th Cir., 1962), the warp and woof of the definitions of "carrying on any trade or business" as used in Section 23 and elsewhere in the Act, is that the activity or enterprise claimed to constitute "carrying on a business" be entered into, in good faith, with the dominant hope and intent of realizing a profit, i. e., taxable income, therefrom.

As Judge Learned Hand pointed out in Thacher v. Lowe, 288 F. 994 (D.C.N.Y. 1922), in ascertaining that intention, the Court must consider if it can be honestly said to be carried on for profit. "[I]f a man does not expect to make any gain or profit out of the [activity], it cannot be said to be a business for profit." (At 995).

■ From the very import of Section 23, which presupposes that the taxpayer has received taxable income before deductions can be taken therefrom, it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. While the expectation of the taxpayer need not be reasonable, and immediate profit from the business is not necessary, nevertheless, the basic and dominant intent behind the taxpayer's activities, out of which the claimed expenses or debts were incurred, must be ultimately to make a profit or income from those very same activities. Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191 (1933); C. I. R. v. Widener, 33 F.2d 833 (3d Cir., 1929); Coffey v. C. I. R., 141 F.2d 204 (5th Cir., 1944); Morton v. C. I. R., 174 F.2d 302 (2d Cir., 1949); Brooks v. C. I. R., supra; Trent v. C. I. R., 291 F.2d 669 (2d Cir., 1961). Absent that basic and dominant motive, the taxpayer's activities, no matter how intensive, extensive or expensive, have not been construed by the Courts as carrying on a trade or business within the purview of Section 23. Coffey v. C. I. R., supra; Morton v. C. I. R., supra;

---

8. Section 23 provides: "In computing net income there shall be allowed as deductions: (a) * * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * traveling expenses * * *" and "(k) (1) * * * [d]ebts which become worthless within the taxable year * * * [but this does] not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt * * *." And under subsection (k) (4), a business debt is one "which is incurred in the taxpayer's trade or business."

Treasury Regulations 118 (1939 Code), § 39.23(k)–6 (b): "The character of the debt for this purpose * * * is to be determined * * * by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt * * *" is a business debt.

Thacher v. Lowe, supra; White v. C. I. R., 227 F.2d 779 (6th Cir., 1955); Kerns Wright, 31 T.C. 1264, aff. 274 F.2d 883 (6th Cir., 1960); Stephen H. Tallman, 37 B.T.A. 1060.

As stated in the regulations, each case must be decided upon its own particular facts. The evidence in this case clearly indicates that the taxpayer participated very actively in the management and operation of the Jockey Club from its beginning. It was he, the vice-president, and not president Smith, who testified before the Special Master in June as to the proposed budget and financing. It was he who undertook to manage and operate the track on its second and last racing meeting. The statement that he spent about half of his time in 1953 in Las Vegas in connection with the Jockey Club is corroborated by the checks he wrote and the hotel bills he incurred in Las Vegas during that period.

Even conceding that the taxpayer has proved that he actively participated in the management of the Jockey Club, nevertheless his activities must still be subjected to the fundamental test: viz., were those activities engendered by a dominant income or profit motive? Turning our spotlight on that question, we find in taxpayer's Opening Brief the statement: "No firm arrangement had been made for the payment of salaries to the taxpayer." The best and *only* evidence of expectation of income or profit from Hirsch's activities as vice-president and member of the executive committee was that when he "first became a member of the executive committee it was discussed on a couple of occasions—that when the track was successful that all the members of the executive committee would be paid." It would thus appear then that Hirsch accepted the vice-presidency and accepted membership on the executive committee *before* there was ever any discussion of possible pay. Too, the record discloses no standards by which pay to members of the executive committee would be measured. There was no evidence that anything ever appeared in the minutes of either the executive committee or the board of directors concerning any such possible pay. There was no evidence that there was any ratification by the board of directors of the two "discussions" in the executive committee. Lou Smith, president and also on the executive committee and witness for the taxpayer, made no statement concerning any such discussion of pay to members of the executive committee.

In his attempt to bolster up such thin evidence of a profit motive underlying his claimed business of being a corporate executive, the taxpayer conjoined thereto the entirely different "business" of being a track operator, for which services his expenses were actually paid, and "if he had continued" (to operate the track, he was to have been paid) "a salary", (amount undisclosed). In other words, he was to have been a salaried employee of the Jockey Club, viz., a track operator, similar to Webb Everett. While a taxpayer may be engaged in more than one business, Folker v. Johnson, 230 F.2d 906 (2d Cir., 1956); Farish v. C. I. R., 103 F.2d 63 (5th Cir., 1939); John Abbott, 38 B.T.A. 1290; C. I. R. v. Field, 67 F.2d 876 (2d Cir., 1933), the deductions which may be taken under Section 23 must be proved to have been expenses or losses incurred through carrying on a particularized trade or business. Cf. Higgins v. Commissioner, supra; Giblin v. C. I. R., 227 F.2d 692 (5th Cir., 1955).

Hirsch was no tyro in the field of corporate business or race track operations, yet he offered nothing to the Tax Court on the most important question of the profit or income motive underlying his Jockey Club activities—other than those two nebulous discussions concerning possible payment. Even though Hirsch specially requested a finding that he had performed his duties as a member of the executive committee with full expectation of receiving compensation at such time as the track was successful, the Tax Court made no such finding.

As was true of the taxpayer in Young v. C. I. R., 268 F.2d 245 (9 Cir., 1959);

Hearn v. C. I. R., 309 F.2d 431 (9 Cir., 1962), and Kerns Wright v. C. I. R., supra, we, like the Tax Court, are not convinced that Hirsch became a director of the Jockey Club and the most active member of its executive committee for the basic purpose of making a profit or receiving income from the activity of being a corporate executive of the Club. We agree with the Tax Court that on the whole record "The more ready inference is that he undertook his executive activities out of an interest in his extensive bondholdings in the Jockey Club." From a review of the checks contained in Exhibit #6, totaling over $13,000 (this does not include any checks in payment of Las Vegas hotel bills during 1953), of which four checks totaling $5,000 were cashed at Las Vegas hotels on May 16 and 17, 1953, it would appear that the Jockey Club venture might also have served the purpose of giving Hirsch a supplemental excuse for being in Las Vegas.

This Court has repeatedly stated the fundamental rule that in reviewing a decision of the Tax Court, the Court of Appeals is "not accorded the right to retry the issues *de novo* on the record and we must affirm unless the Tax Court decision was arrived at through plain error. * * * The decision of the Tax Court is entitled to the same consideration as the decision of a district court in a case tried without a jury. To reverse it we must find that it is clearly erroneous, in other words, that the taxpayer's evidence so clearly showed the Commissioner to be wrong that the decision in the Commissioner's favor was palpably in error." Young v. C. I. R., supra.

As was held in Commissioner v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171, and in innumerable other cases the burden is always upon the taxpayer claiming deductions to prove that the facts bring his case squarely within the deduction provisions of the statute.

[11] Similar to our statement in Hearn v. C. I. R., supra: We have reviewed the record and find therefrom the Tax Court's opinion that the taxpayer has failed to show that he was in the trade or business of being an officer or director of the Jockey Club, is strongly supported and amply justified.

The decision of the Tax Court is *affirmed*.