**INDEPENDENT ELECTRIC SUPPLY, INC., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Frank PRESTIPINO and Leana Prestipino, Hildegard K. Marks, and Jean D. Littlefield, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 85–7060, 85–7077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1985.

Decided Jan. 24, 1986.

Clarence J. Ferrari, San Jose, Cal., for Independent Elec. Supply.

J. Richard Johnston, Johnston & Horton, Oakland, Cal., for petitioners-appellants.

Richard Driscoll, Ann Belanger Durney, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before WRIGHT, KENNEDY, and BEEZER, Circuit Judges.

KENNEDY, Circuit Judge:

The taxpayers in these consolidated cases appeal the Tax Court's disallowance of deductions for depreciation, ordinary and necessary business expenses, and research and development expenses.[1] We affirm.

The appellants each invested in limited partnerships, trusts, or both, set up by Fred Solomon and George Nicoladze for the ostensible purpose of acquiring and exploiting patents. The patents were acquired for the partnerships and trusts by Solomon and Nicoladze for relatively small amounts of cash ($0 to $300,000) and relatively large nonrecourse obligations ($497,-000 to $250,000,000). Many were acquired hastily in an effort to avoid limitations on distributive partnership losses attributable to nonrecourse debt which took effect on January 1, 1977. I.R.C. § 704(d) (1976) (subsequently amended by Revenue Act of 1978, Pub.L. No. 95–600, § 201(b), 92 Stat. 2763, 2815–16). The patents, over thirty-five in number, include rights to inventions as diverse as a geothermal turbine, acquired in December 1979 for $300,000 down and a $149,000,000 nonrecourse obligation, and a disintegrating golf tee, acquired, like approximately half the patents, for $3,000 down and a $2,000,000 nonrecourse obligation. None of the patents has earned any net income, and losses associated with the sixteen partnerships and trusts invested in by appellants have exceeded $90,000,-000.

The appellants claimed, in their capacities as limited partners or trust benefi-

---

**1.** Five cases were consolidated below. Petitioners in one case, Paul J. Lahr and Carol Lahr, have not appealed. The Tax Court's opinion is reported in *Paul J. Lahr v. Commissioner,* 53 T.C.M. (P–H) ¶ 84,472 (1984).

ciaries, deductions for depreciation under I.R.C. § 167(a), ordinary and necessary business expenses under I.R.C. § 162(a), and research and development expenses under I.R.C. § 174(a). As a result of these deductions, the appellants reported large losses with respect to their interests in the partnerships and trusts, losses far in excess of their actual investments. The losses largely reflect the depreciation deductions taken against the inflated basis in the patents provided by the nonrecourse indebtedness.

The Commissioner determined deficiencies in the taxpayers' federal income taxes. The Tax Court denied the taxpayers' petitions for redetermination of the deficiencies, holding that the taxpayers' patent activities did not constitute a "trade or business" required for deductibility under I.R.C. §§ 162(a), 167(a), and 174(a) since the patents were not held or exploited for profit. Rather, the court found that the primary motivation for the formation and continuance of the partnerships and trusts was tax avoidance, noting that " 'if anything can be described as an "abusive tax shelter," this is it'." *Paul J. Lahr v. Commissioner*, 53 T.C.M. (P-H) ¶ 84,472, at 1884, 1893 (1984) (quoting *Flowers v. Commissioner*, 80 T.C. 914, 941 (1983)).

Appellants argue that the Tax Court clearly erred in finding that the trusts and partnerships were not created and continued with the intention of making a profit. Moreover, appellant Independent Electric Supply, Inc. (IES) argues that the court clearly erred in finding that it did not have a profit motive when it invested in three of the patent trusts. IES argues that its own motivation is relevant because, it claims, the existence of a profit motive for a trust should be determined with respect to each beneficiary. Because the Tax Court found no profit motive at either the trust or beneficiary level, it declined to decide at which level business motive should be assessed. We sustain the Tax Court's findings regarding the nonexistence of a profit motive, and we affirm.

The deductions taken by the appellants were claimed under I.R.C. § 167(a), granting a deduction for depreciation of property "used in [a] trade or business" or "held for the production of income"; I.R.C. § 162(a), granting a deduction for ordinary and necessary expenses "incurred ... in carrying on any trade or business"; and I.R.C. § 174(a), granting a deduction for "research or experimental expenditures ... in connection with [a taxpayer's] trade or business." Consequently, in order for a deduction to be taken under any of these provisions, the expense must arise in or in connection with a "trade or business." We have recognized that the primary inquiry when determining whether a particular activity constitutes a trade or business is to ask whether the activity was undertaken or continued "in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963) (interpreting former I.R.C. § 23 (1939)); *see Bolaris v. Commissioner*, 776 F.2d 1428, 1432 (9th Cir.1985) (considering §§ 167 and 212); *Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir.1984) (citing *Hirsch*); *DePinto v. United States*, 585 F.2d 405, 408 (9th Cir.1978) (quoting *Hirsch*). In other words, the "basic and dominant" motive behind the taxpayer's activities must be "to make a profit or income from those very same activities." *Hirsch*, 315 F.2d at 736; *see Mercer v. Commissioner*, 376 F.2d 708, 710–11 (9th Cir.1967); *Doggett v. Burnet*, 65 F.2d 191, 194 (D.C. Cir.1933). While the focus of the test is thus on the subjective intention of the taxpayer, objective indicia may be cited to establish the taxpayer's true intent. Treas. Reg. § 1.183–2(a) (1972). Treasury Regulation § 1.183–2(b) lists factors to be considered when ascertaining a taxpayer's intent:

1. The manner in which the taxpayer carries on the activity;

2. The expertise of the taxpayer or his advisors;

3. The time and effort expended by the taxpayer;

4. The expectation that assets used in the business may appreciate in value;

5. The success of the taxpayer in carrying on similar or dissimilar activities;

6. The taxpayer's history of income or losses with respect to the activity;

7. The amount of occasional profits, if any, which are earned;

8. The financial status of the taxpayer; and

9. Elements of personal pleasure or recreation.

Treas.Reg. § 1.183–2(b) (1972). While it is true that I.R.C. section 183 itself does not come into play until after it is determined that an activity is not engaged in for profit, the courts have relied on the section 183 factors in conducting the profit motive analysis under section 162. *Brannen*, 722 F.2d at 704. This list is nonexclusive, *id.*, and the assessment of motivation is made after considering all the facts and circumstances of each case, Treas.Reg. § 1.183–2(a) (1972); *see Hirsch*, 315 F.2d at 737.

In reaching its conclusion that the patent activities in this case, whether viewed at the entity or investor level, were not undertaken primarily for profit, the Tax Court observed that (1) the purchase prices of the patents were "grossly inflated" through the use of nonrecourse indebtedness without any real negotiation or serious investigation of patent marketability; (2) the partnerships and trusts were promoted by emphasizing the projected tax benefits of investment in them, potential investors being provided with tax loss projections but little or no information on the economic viability of the patents; (3) no profits were realized by any of the trusts or partnerships at issue, while aggregate losses of over $90,000,000 have been claimed; (4) there was no possibility the patents themselves would increase in value given the grossly inflated price paid for them; and (5) the partnerships and trusts were not operated in a businesslike manner. This court will not disturb the Tax Court's determination unless it is clearly erroneous. *Bolaris*, 776 F.2d at 1432; *Hirsch*, 315 F.2d at 738. Moreover, the taxpayer bears the burden of proving "that the facts bring his case squarely within the deduction provisions of the statute." *Hirsch*, 315 F.2d at 738; *see also Bolaris*, 776 F.2d at 1432 (burden of proving a profit motive on taxpayer).

Appellants focus on the nine factors in Treasury Regulation § 1.183–2(b) in urging that a profit motive existed for the trusts and partnerships. At best, however, appellants manage only to show that their activities *might* have had a profit motive; they do not show that the Tax Court was clearly erroneous in finding that the generation of large tax losses was in fact the dominant motivation behind the trusts and partnerships created and managed by Solomon and Nicoladze. For example, appellant IES argues that the three patent trusts in which it invested—the Geothermal Turbine Patent Trust, the A.C. Generator Trust, and the Apparatus for Sterilizing Meat Products Trust [2]—were (at least at the time of its investment) well managed, employed skilled persons to develop the patents, had made steady progress toward developing prototypes, and received, along with the other trusts and partnerships, the full-time development efforts of Solomon and Nicoladze. Moreover, IES argues that the history of substantial losses suffered by the trusts so far has resulted from "unforeseen or fortuitous circumstances" beyond their control, and that the future profit potential for the patents is "enormous." Unfortunately, there is little support for the prediction of future profitability, there being no evidence of *commercial* (as opposed to *technological*) viability for the patented devices apart from the reports on potential revenues prepared by Plog Research, reports Solomon and Nicoladze required show a ratio of gross sales to patent costs of sixty to one, and IES president Hurd's own inquiries and intuitions. The

2. In the IES case, only the Apparatus for Sterilizing Meat Products and the Geothermal Turbine Patent Trusts are at issue. Evidence regarding the A.C. Generator Trust is relevant only insofar as it sheds light on the motive for continuing the other two trusts.

latter are of little relevance in determining the existence of a profit motive at the trust level, while the former, in the words of the Tax Court, "border on fantasy." *Lahr*, 53 T.C.M. at 1892 (quoting *Flowers*, 80 T.C. at 940). Although the lack of any reasonable expectation of profit will not by itself show the absence of a profit motive, the high nominal purchase prices of the patents (prices that have not been shown to have any relationship to fair market value), and the emphasis on projected tax losses in the marketing of the trusts and partnerships strongly suggest that the "dominant" motive behind the trusts in which IES invested, like that behind the other trusts and partnerships, was tax avoidance and not the making of a profit from the development of the patents themselves. Against this background the fact that Solomon and Nicoladze devoted their full-time efforts to promoting the trusts and partnerships, or that substantial funds were expended to develop the patents, does not show that they were in fact organized for profit. If the other evidence available indicates, as it does here, the lack of an actual profit motive, "the taxpayer's activities, no matter how intensive, extensive, or expensive have not been construed ... as carrying on a trade or business." *Hirsch*, 315 F.2d at 736.

Perhaps the most important single factor suggesting that the actual motive for the patent activities was tax avoidance rather than even speculative profit is the inflated purchase price of the patents. The individual appellants suggest that the nonrecourse provisions in the notes, and the fact that the purchase price of the patents was generally fixed by Solomon rather than by bargaining, do not indicate lack of a profit motive. They observe that the notes were payable only out of fifty percent of any royalties earned; thirty percent of the royalties were to go to the investors while twenty percent would, at least in the case of the partnerships, go to general partner Solomon. We reject this contention. That the promoters and investors would receive an arbitrary percentage of future royalty income prior to complete repayment of the notes does not show that the promoters or investors in fact expected such income, or, if they did, that its realization was the dominant motive behind their activities. In fact, the absence of any evidence that these percentages were ever the subject of bargaining reinforces the view that the purchase prices for the patents were not intended to reflect patent value, but rather to provide a high basis from which to generate tax losses. Moreover, the lack of any correlation between patent value and purchase price suggests an alternative ground for disallowing the claimed depreciation deductions. Without such a correlation, the taxpayers have not shown that the nonrecourse indebtedness represents any real investment on their part in the patents. Consequently, including such indebtedness in basis for *depreciation purposes* would be improper. *See Brannen*, 722 F.2d at 701 (citing *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir.1976); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), aff'd, 670 F.2d 855 (9th Cir.1982)).

Appellant IES raises a different challenge to the finding that the purchase of the patents was conducted in a manner inconsistent with the existence of a profit motive. IES claims that the three patents it invested in were acquired by the trusts only after (1) a Plog report was prepared for the patent, (2) the rejection of other patents, and (3) review of the patent by Solomon, Nicoladze, and at least one or two other associates. As noted above, however, there was evidence that the Plog reports were not prepared as honest assessments of the economic viability of the patents. Moreover, that Solomon and Nicoladze "reviewed" the patents and did not accept every one, while perhaps some evidence of selectivity and thus of a profit motive, does not render the Tax Court's finding clearly erroneous. The fact remains that none of the appellants, including IES, have demonstrated that the patents selected had a value anywhere near the nominal purchase prices. They fail to show that the trusts and partnerships at issue were organized in a businesslike man-

ner primarily for profit, rather than as vehicles for the generation of tax losses.

Another factor that may be considered in assessing motivation is the financial status of the taxpayer. Treas.Reg. § 1.183–2(b)(8) (1972). Appellants assume the financial position of Solomon and Nicoladze is all that is relevant if motive is to be assessed at the entity level. This is excessive formalism. That Solomon and Nicoladze marketed the trusts and partnerships for their tax benefits—and that the investors in fact realized those benefits [3]—is evidence that the primary motive for the creation and promotion of the partnerships and trusts was not the earning of a profit.

IES argues that profit motive should be tested at the beneficiary (investor) level of the trusts, not by examining the motive of the promoters who set up the trust entity. Consequently, IES contends that if it had a profit motive when investing in the trusts, then it is entitled to claim its proportionate share of the losses incurred regardless of whether the trust itself was organized for profit. The position has little merit, for otherwise similarly situated investors could be treated differently even if a trust in which they invested was formed for the sole purpose of tax avoidance. Even assuming arguendo that the investor's motive controls, however, the Tax Court found that IES did not have a profit motive when investing in the trusts. IES' argument rests on the fact that the three patents held by the trust were in areas arguably related to the firm's electrical business, that they appeared promising to the firm's president, Hurd, and that material progress had been made in developing prototypes. In light of the speculative nature of any return on the investments, the financial position of IES, and Hurd's own characterization of the investments as "tax investments," the Tax Court's finding that tax avoidance supplied the dominant motive for the investments was not clearly erroneous. This is especially true in light of the fact that the deductions claimed by IES and challenged here completely eliminated its tax liability in 1979, and virtually eliminated it in 1980.

Appellants raise two further challenges to the Tax Court's decision. First, they argue that the court erred in finding that Solomon, Nicoladze, and Littlefield had been convicted of tax fraud without expressly recognizing in its opinion that evidence of the convictions was admitted for impeachment only. Second, they object to the finding that appellant Marks worked as Nicoladze's secretary. Whatever the merits of these contentions, appellants make no showing that the Tax Court gave any weight, let alone determinative weight, to these facts, and consequently any error that may have been committed was harmless. *See Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1307 (9th Cir.) (no showing that trial court gave "determinative weight" to challenged evidence), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 280, 78 L.Ed.2d 259 (1983); *Pursche v. Atlas Scraper & Engineering Co.,* 300 F.2d 467, 487–88 (9th Cir.1961) (in nonjury trial, admission of incompetent evidence not grounds for reversal where there is competent evidence to support the findings), *cert. denied,* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962).

We conclude that the Tax Court's finding that the trusts and partnerships set up by Solomon and Nicoladze were not created and continued for profit is not clearly erroneous. Consequently, the judgments of the Tax Court are AFFIRMED.

---

3. For example, IES paid *no tax* in 1979, and only $1,809 of tax in 1980.