STEVEN R. BRAND AND LORINE E. BRAND, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Brand v. Commissioner
Docket Nos. 4192-85; 10859-85; 15725-85; 18348-85; 45848-85.
United States Tax Court
T.C. Memo 1988-194; 1988 Tax Ct. Memo LEXIS 219; 55 T.C.M. (CCH) 761; T.C.M. (RIA) 88194; May 3, 1988; As amended August 18, 1988 Warren Nemiroff, for the petitioners. William H. Quealy, Jr., and Joan E. Steele, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Petitioner
Section
Section
Section
(Docket No.)
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659 [2]
Steven R. and
1981
$  6,966.00
$ 348.30
*
$ 2,089.80
Lorine E. Brand
1982
3,727.00
186.00
**
1,118.00
(4192-85 & 45848-85)
Louise Ludwig
1981
4,154.00
297.70
***
1,246.00
(10859-85)
John O. and
1978
2,311.00
116.00
--
693.00
Joanne Hiles
1979
3,966.00
198.00
--
1,190.00
(15725-85)
1980
3,912.00
196.00
--
1,174.00
1981
10,171.00
509.00
***
3,051.00
Edward F. and
1981
11,063.00
553.00
***
3,319.00
Marlene P. Spang
1982
5,044.00
252.00
***
1,513.00
(18348-85)
*221 Respondent has conceded the section 6653 additions to tax for negligence. The issues for determination are (1) whether petitioners have established that they acquired interests in FoodSource containers with an actual and honest profit objective and (2) whether respondent abused his discretion in refusing to waive additions to tax under section 6659. Petitioners have expressly adopted the factual findings in Noonan v. Commissioner,T.C. Memo. 1986-449, as to the fair market value of FoodSource containers, the manner of determining adjusted basis in a container, and the earliest date placed in service for any container interest. They have assumed in this record and not disputed those facts found in Noonan under the headings "Background of FoodSource," "The FoodSource Containers," "Manufacturing and Operating Problems," and "Refinancing," and those facts are by this reference *222 incorporated in this opinion as explanatory background. Determination of the applicability of the parties and application of Todd v. Commissioner,89 T.C. 912 (1987), on appeal (5th Cir., Jan. 16, 1988). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulations are incorporated in our findings by this reference. Petitioner Louise Ludwig (Ms. Ludwig), petitioners Steven R. and Lorine E. Brand (the Brands), and petitioners John O. and Joanne Hiles (the Hiles) were residents of California at the time they filed their petitions. Petitioners Edward F. and Marlene P. Spang (the Spangs) were residents of Nevada at the time they filed their petitions. Petitioner Ludwig
From 1965 through 1983, Ms. Ludwig was a professor of psychology at Los Angeles City College. She was introduced to the FoodSource program by Stanford M. Miller (Miller). Miller had retired in 1977 from his position as a professor at Los Angeles City College, where he taught foreign languages, math, electronics, and history. In 1981, Miller was a paid sales representative for FoodSource Sales Corporation. Prior to purchasing her interest in the FoodSource container, *223 Ms. Ludwig consulted her brother, Warren Ludwig, who was a vice president of Lewis Refrigeration and knowledgeable in refrigeration processes. She discussed with him the use of nitrogen in refrigeration, but she did not ask him whether FoodSource would be a good investment for her. She relied solely on the representations of Miller and FoodSource with respect to her investment. She did not conduct any independent inquiries into the reasonableness of the projections used by FoodSource in its offering materials; the reasonableness of the purchase price; the feasibility of operating a fractional interest in the container; or the commercial viability of the FoodSource program. She had no experience in the trucking, shipping, or produce distribution industry, or other relevant business experience. She did not obtain any appraisal, inspect a container, or enter into any separate agreement or engage in any activity to insure that the container was completely manufactured, paid for, delivered, or placed in operation. On or about May 30, 1981, Miller sold to Ms. Ludwig a 10 percent interest in a FoodSource container for a stated purchase price of $ 26,000. Ms. Ludwig executed a promissory *224 note in the amount of $ 21,500. At some subsequent time, under circumstances that Ms. Ludwig cannot explain, the May 30, 1981, note was marked "CANCELLED NOV [illegible] 1981." Ms. Ludwig then executed a second promissory note. [Text Deleted by Court Emendation] On a Schedule C attached to her 1981 Federal income tax return, Ms. Ludwig reported a loss of $ 3,680 from a "trucking" business activity. She claimed an adjusted basis of $ 26,000 for her 10 percent interest in a FoodSource container, an investment tax credit of $ 2,600, and depreciation expense of $ 3,900. Thus she reduced her income tax liability for 1981 by $ 4,154, and she expected significant additional tax benefits in subsequent years. Petitioners Brand
The Brands were introduced to the FoodSource program by the parents of Mrs. Brand, who had themselves invested in a FoodSource container through a certified financial planner, Jack Prosen. Mr. Brand's father, who was in the business of shipping foundry products, was also consulted. From the time he was 18 years old through the years in issue, Mr. Brand was a sportswriter. Neither of the Brands had any experience in the trucking, shipping, or produce *225 distribution industry, or any other relevant business experience. Prior to investing in the FoodSource program, they did not conduct independent inquiries into the reasonableness of the projections used by FoodSource in its offering materials; the reasonableness of the purchase price; the feasibility of operating a fractional interest in a container; or the commercial viability of the FoodSource program. During the years in issue, they did not inspect the container or enter into any separate agreements or engage in any activity to insure that the container was completely manufactured, paid for, delivered, or placed in operation. Sometime after September 28, 1981, the Brands purchased a 20 percent interest in a FoodSource contained for a stated purchase price of $ 52,000, of which $ 9,000 was paid in cash. The balance of the purchase price was reflected in a promissory note in the face amount of $ 99,273.60, of which $ 43,000 was designated to be principal. The Brands made no payments on the promissory note. On a Schedule C attached to their 1981 Federal income tax return, the Brands reported a loss of $ 5,215 from the purported operation of their FoodSource container. They *226 claimed an adjusted basis of $ 52,000, investment tax credit of $ 5,200, and depreciation of $ 5,200. On Schedule C attached to their 1982 income tax return, the Brands reported a business loss from "equipment rental" of their FoodSource container of $ 11,031, resulting in substantial part from depreciation claimed in the amount of $ 11,570. In 1983, the Brands invested in a partnership known as High Tech in an attempt to salvage their FoodSource investment. Mr. Brand spoke to John Akiskalian, a former [Text Deleted by Court Emendation] salesman for FoodSource, about attempting to secure release of their container from the manufacturer and about putting it in operation independent of FoodSource. The Brands did not know who the other investors in High Tech were. They relied solely on representations of Akiskalian during 2 to 3 hours of telephone conversations. Petitioners Spang
The Spangs were introduced to the FoodSource program by Phillip M. Rulon (Rulon), a bookkeeper/accountant and the Spangs' tax preparer, who in turn had been introduced to FoodSource by his insurance salesman. Mr. Spang was a Federal employee and, during the years in issue, was the State Director *227 for the Department of Interior, Bureau of Land Management. During 1981, Rulon became a commissioned sales representative for FoodSource. He received 8 percent of the cash paid to FoodSource on sales of FoodSource containers solicited by him, and his commission accounted for a substantial portion of his income during 1981 and 1982. Rulon conveyed to the Spangs his impressions of the FoodSource program based upon discussions with David A. Dixon (Dixon) and Robert McKee (McKee) and visits to the FoodSource facilities. Neither the Spangs nor Rulon conducted independent inquiries into the reasonableness of the projections used by FoodSource in its offering materials; the reasonableness of the purchase price; the feasibility of operating a fractional interest in the container; or the commercial viability of the FoodSource program. Neither the Spangs nor Rulon had any experience in the trucking, shipping, or produce distribution industry, or any other relevant business experience. In 1981, the Spangs purchased a 25-percent interest in a FoodSource container. They paid $ 20,000 in cash and signed a promissory note dated December 23, 1981, in the amount of $ 52,000. In 1983, the *228 Spangs signed a substitute note. [Text Deleted by Court Emendation] On Schedule C attached to their 1981 Federal income tax return, the Spangs claimed an adjusted basis of $ 65,650 for their interest in the FoodSource container and claimed investment tax credits of $ 6,565 and depreciation deductions of $ 9,848. On their Schedule C attached to the Federal income tax return for 1982, they reported a loss from "shipping" of $ 11,419, resulting in substantial part from a claim of depreciation expense in the amount of $ 14,443. Although the 1982 Schedule C reported gross rental income, that income was merely the reflection of false representations by FoodSource, as described in Noonan v. Commissioner,T.C. Memo. 1986-449. The container had not been placed in service and was not earning income during the years in issue. As a result of these claims on their tax returns, the Spangs recovered more than their initial cash investment in the container. After the years in issue, the Spangs and Rulon invested in a "joint venture" called Sierra Shippers, which in turn invested in High Tech. Sierra Shippers was a name picked out of the air by Rulon and was not a legal *229 entity of any kind. Petitioners Hiles
The Hiles were introduced to the FoodSource program by their return preparer, Harold Collins (Collins), and discussed it with a cousin, Robert McKee (McKee), prior to investing. McKee was the engineer responsible for the design of the FoodSource container and was an employee of FoodSource. McKee received compensation in relation to purchase of the container by the Hiles over and above his salary from FoodSource. McKee, in his own words, was "shocked" when he found out that FoodSource was selling the containers for a price of $ 260,000, and he "questioned it very greatly." He advised the Hiles that the container would not make money if merely used in transportation but would "if applied properly" to open new markets. He also advised the Hiles that Dixon's prior venture with a Nitrol trailer was a failure. [3]
Prior to their investment in the containers, the Hiles did not conduct any [Text Deleted by Court Emendation] independent inquiries into the reasonableness of the projections used by FoodSource *230 in its offering materials; the reasonableness of the purchase price; the feasibility of operating a fractional interest in the container; or the commercial viability of the FoodSource program. They had no experience in the trucking, shipping, or produce distribution industry, or any other relevant business experience. They did not obtain an appraisal, inspect a container, or enter into any separate agreements or engage in any activity to insure that the container was completely manufactured, paid for, delivered, and placed in operation. On or about September 30, 1981, the Hiles purchased a 60 percent interest in a FoodSource container, with a cash down payment of $ 27,000. They executed a promissory note in the face amount of $ 297,820.80, of which $ 129,000 was described as principal. The note did not call for any payments other than from revenue for 20 years. Starting in 1983, and through March 19, 1986, they made payments on the note in various amounts totaling $ 10,156. On September 30, 1981, the Hiles purchased on identical terms an additional 10-percent interest in a FoodSource container on behalf of their closely held corporation, Windham House. Co-owners with Windham *231 House were Collins and McKee. On a Schedule of Rents and Royalties attached to their Federal income tax return for 1981, the Hiles reported a rental loss of $ 23,445 in relation to their interests in the FoodSource container. They claimed an adjusted basis in the container of $ 156,000, an investment tax credit of $ 16,887, and depreciation of $ 23,400. They claimed an investment tax credit carried back to offset their income tax liabilities for 1978, 1979, and 1980, after reducing their 1981 tax liability by $ 10,171. On their tax return for 1982, they claimed a previously unused investment tax credit of $ 3,188. Respondent's Waiver Policy
Prior to the issuance of the Court's opinion in Noonan v. Commissioner,T.C. Memo. 1986-449, on September 17, 1986, in order to settle cases involving the FoodSource containers, the Internal Revenue Service was willing to waive one-half of the addition to tax determined under section 6659 in relation to valuation overstatements claimed on taxpayers' returns. [4] Following the Court's opinion in Noonan, the Internal Revenue Service revised its guidelines to the effect that no part of the addition to tax under section *232 6659 would be waived unless a taxpayer could establish that the taxpayer had previously accepted an offer of settlement; section 6659 was not applicable to the year in issue; the taxpayer had aopted the method of determining basis in the container described in Rev. Rul. 82-224, 1982-2 C.B. 5, in the original return or in an amended return filed at or about the time of publication of the ruling; or the taxpayer relied on some independent investigation of the value of the container. Both before and after filing of the opinion in Noonan, the settlement guidelines formulated by the Internal Revenue Service permitted the waiver of all or part of the taxpayer's liability under section 6659 on a showing that the taxpayer relied on some independent appraisal of the value of the container.
*233 OPINION Profit Objective
The parties are arguing in these cases certain extensions or limitations of our opinion in Noonan. Specifically, respondent argues that petitioners fall within our statement in Noonan that: On the record it appears that most of the FoodSource investors did very little that would convince us that they had an actual and honest profit objective under the tests enunciated in the above [cited] cases and specifically applied to comparable property in Sutton v. Commissioner,84 T.C. 210, 222-226 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986). [52 T.C.M. 534 at 546, 55 P-H Memo T.C. par. 86-449 at 2074.]
Two investors were there distinguished from the general group as follows: In view of their special backgrounds and specific activities in relation to the containers, however, we conclude that petitioners Henricks and Hillendahl have demonstrated that they possessed an actual and honest profit objective with respect to their container interests. Both petitioners consulted parties knowledgeable in the food industry prior to purchasing their respective interests. Henricks repeatedly questioned *234 FoodSource regarding the use of and accounting for his container, and he expended substantial effort and money in attempting to profitably employ his containers. We do not think that such expenditures were undertaken merely to secure the large tax benefits claimed on their returns, as was the case with the taxpayers in Sutton v. Commissioner,84 T.C. at 225-226. * * * Although Hillendahl presents a closer case, we conclude that he too was motivated by economic profit apart from tax benefits. Like Henricks, Hillendahl did not blindly rely upon the attractive economic projections in the offering material; he undertook his own discounted cash flow analysis. Through his knowledge of the Hawaiian economy and agriculture, Hillendahl discovered what he believed was a unique opportunity profitably to employ the containers. He similarly continued attempting to open new markets for the containers after their acquisition. [52 T.C.M. 534 at 546, 55 P-H Memo T.C. par. 86-449 at 2074.]
Petitioners acknowledge that they are not "active" in the sense that Henricks and Hillendahl were with respect to the containers; they contend, however, that they, as "passive" *235 investors, are entitled under section 212 to the tax benefits claimed. We commented in Noonan that the FoodSource containers, unlike property involved in many "tax shelter" cases, were actually produced and had some commercial potential. The manufacture of FoodSource containers and their use in commerce were the types of activities that tax incentives were intended to encourage. They represented innovative technology that, if successful, would have been useful in the distribution of food and plant products. Although the FoodSource program in the form presented to petitioners had some characteristics of generic tax shelters as set forth in Rose v. Commissioner,88 T.C. 386, 412-413 (1987), on appeal (6th Cir., Dec. 14, 1987), we do not conclude that the transactions here in issue were without economic substance. We must still decide, therefore, whether petitioners' activities were not engaged in for profit within the meaning of section 183. [5]
*236 Petitioners argue that the standard for deductions under section 212 is "extraordinarily liberal, and would easily extend to any of the subject petitioners." Petitioners have cited no authority for that proposition, and their theory seems to be totally lacking in legal support. Section 183, with which we are concerned, makes no distinction between deductions allowable under section 162 or allowable under section 212(1) or (2). [6]
Petitioners cite Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984), for the statement that "before we can apply section 183, we must first determine whether the deductions from the activity are allowable under section 162 or 212." As there stated, section183 is not a disallowance provision; it has the effect of allowing deductions to the extent *237 of income from an activity not engaged in for profit. The Court in Brannen went on to discuss the predicates for deductions under section 162 and depreciation under section 167 (such as those in issue here) and stated: It is well settled, that in order to constitute the carrying on of a trade or business under section 162(a), the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See also Hager v. Commissioner,76 T.C. 759, 784 (1981); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). * * * [Fn. ref. omitted; 78 T.C. at 501.]
See Groetzinger v. Commissioner, 480 U.S.     (1987). A comparable requirement has consistently been applied in cases decided under section 212. See Bolaris v. Commissioner,776 F.2d 1428, 1432-1433 (9th Cir. 1985), revg. on another issue 81 T.C. 840 (1983); Beck v. Commissioner,85 T.C. 557, 569-570 (1985); *238 Allen v. Commissioner,72 T.C. 28, 33 (1979); Jasionowski v. Commissioner,66 T.C. 312, 318-320 (1976). Section 212 is not a catchall for deduction of all nonpersonal expenses. Section 212 is coextensive in most respects with section 162; and taxpayers may not deduct expenses under section 212 that could be deducted under section 162(a) were they connected to a trade or business. Trust of Bingham v. Commissioner,325 U.S. 365 (1945) (discussing predecessors of the two sections); Beck v. Commissioner,15 T.C. 642, 669 (1950), affd. per curiam 194 F.2d 537 (2d Cir. 1952). As we have noted: "except for the requirement of being incurred in connection with a trade or business," * * * a deduction under section 212 "is subject * * * to all the restrictions and limitations that apply in the case of the deduction under * * * [section 162(a)] of an expense paid or incurred in carrying on any trade or business." [Estate of Davis v. Commissioner,79 T.C. 503, 507 (1982), quoting H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 373, 430, the legislative history to the *239 predecessor of section 212.] The Court has not adopted, as petitioners suggest, an "active" or "passive" test for distinguishing between investors who have an actual and honest profit objective and those who do not. We recognize that the inquiry extends to the entirety of multilayered transactions, in which we consider not only the activities of the taxpayers but those of the persons to whom they delegate responsibility for managing the activity. Flowers v. Commissioner,80 T.C. 914, 932 (1983); see Beck v. Commissioner,85 T.C. at 573-574; section 1.183-2(b)(2), Income Tax Regs. We also recognize that there need not be a reasonable expectation of profit but the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. See Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The remote possibility or vague hope that an activity will result in a profit, however, will not entitle a taxpayer to the deductions claimed if that possibility or hope was not an inducement to the transaction. Few, if any, seekers *240 of tax shelter would reject an incidental economic profit. Participation in an activity for the purpose of securing tax benefits, without regard to economic profit, is what disentitles taxpayers to the deductions and credits claimed. Petitioners argue that their level of income was not as high as that of those they would characterize as "typical tax shelter investors." Yet each petitioner claimed that the tax credits and deductions relating to an interest in a FoodSource container totally or substantially eliminated his or her tax liabilities for the years in issue, and those tax benefits were expected to equal or exceed the actual cash investment in the container interests. See Independent Electric Supply, Inc. v. Commissioner,781 F.2d 724, 729 (9th Cir. 1986), affg. Lahr v. Commissioner,T.C. Memo. 1984-472. Thus, they would have no reason not to make the investment, even though it would not withstand scrutiny on economic terms. Their indifference to the correctness of the improbable claims of fair market value of the containers and projections of potential income can be explained only by the conclusion that any profit would be lagniappe, *241 i.e., a gratuity or bonus and not a primary inducement to the transaction. In this regard, our characterization of the FoodSource container as an actual product with commercial potential does not, standing alone, satisfy petitioners' burden of proof. Here, as in Estate of Baron v. Commissioner,83 T.C. 542, 558 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we should weigh the disparity between any potential before tax profit and the expected tax benefits in the context of all factors involved in determining the existence of the requisite profit objective. See also Fox v. Commissioner,82 T.C. 1001, 1021 (1984). Of all the cases in which those factors have been applied, Sutton v. Commissioner,84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), is the most in point because the asset in question there, the Nitrol trailer, was, as discussed in Noonan v. Commissioner,T.C. Memo 1986-449, the predecessor of the FoodSource container. As in Sutton,84 T.C. at 225: (1) We give greater weight to objective factors than to petitioners' mere statement of intent. *242 Section 1.183-2(a), Income Tax Regs. (2) We do not believe that petitioners would have agreed to pay a pro rata portion of $ 260,000 for their interests in FoodSource containers if they had been concerned with the economic profitability of the investment. See Independent Electric Supply, Inc. v. Commissioner,781 F.2d at 728. (3) None of the persons on whom petitioners relied were qualified to independently evaluate the profit projections contained in the FoodSource promotional material, and they relied exclusively on the representations of Dixon. (4) Petitioners did not follow up their investments during the years in issue with any attempt to verify completion of the containers or placement of their containers in an income-producing use. Although they claimed to have relied on FoodSource to operate the containers, as we found in Noonan, the contractual documents that they signed disavowed any obligation of FoodSource to operate the containers for them. (5) The subsequent refinancing by some petitioners and the activities of High Tech can be explained only as an attempt to protect their future and previously claimed tax benefits. See *243 also Estate of Baron v. Commissioner,83 T.C. at 560. We have considered each of the other factors set forth in the regulations promulgated under section 183.[7] Except for the absence of elements of personal pleasure or recreation, consideration of none of the factors favors petitioners' contentions. Petitioners have urged the Court to accept the sincerity of their claimed intention to make a profit, but they have presented no objective evidence distinguishing their cases from the innumerable other cases in which similarly situated taxpayers have been held not have the requisite profit objective. See generally Independent Electric Supply, Inc. v. Commissioner, supra.They are not entitled to the deductions or investment tax credits in issue. *244 In this regard, we have considered that petitioners Hiles presented the strongest case of dual profit and tax objectives. They relied to some extent on their cousin, McKee, who was knowledgeable about the containers and a co-invester in one of the containers. They claim that they individually or by joint acquisition with their closely held corporation, their tax preparer, and McKee, acquired 'control' of a container and thereby avoided the lack of feasibility of operating a fractional interest. None of this evidence, however, overcomes the application of the objective factors repeatedly applied in prior cases, such as Sutton. Their failure to conduct any independent inquiries into the inflated price of the container and its prospects for profitable use, after McKee's cautionary advice, is the most compelling evidence. As with the other petitioners, the hope for profit did not rise to a level that can be characterized as 'actual and honest' or 'primary' or overcome the inference from the record that their tax objective was predominant and controlling. Section 6659
Section 6659 imposes a graduated addition to tax to underpayments by individuals, such as petitioners, attributable *245 to a valuation overstatement. A valuation overstatement includes, as applicable to these petitioners, a claim of adjusted basis that is 150 percent or more of the correct adjusted basis. Section 6659(a) and (c). The applicable graduated amount in these cases is 30 percent of the underpayment attributable to the valuation overstatement, because the adjusted basis claimed by each petitioner was more than 250 percent of the correct basis, i.e., his or her respective cash investment. Section 6659(e) provides: (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith.
Petitioners claim that respondent has abused his discretion in refusing to waive the section 6659 addition to tax in their cases. Petitioners have not persuaded us, however, that they are entitled to a waiver. Petitioners have presented nothing that could fairly be characterized as a reasonable basis for claiming an adjusted basis equal to their percentage of a container multiplied by $ *246 260,000 -- the state purchase price of a container. The only witness who was genuinely knowledgeable about the FoodSource container was McKee, who testified that he was "shocked" when he first heard the purchase price. His testimony at trial described a later attempt to rationalize the price, based on tests conducted after each petitioner in these cases had made his or her investment. His advice to his cousins, the Hiles, at the time of their investment was that, if they were competing with transportation, rather than opening new markets, they would not make money. He testified, consistent with our conclusions in Noonan, "that's where FoodSource fell down." None of the other petitioners or their advisors offered any reason to believe that the FoodSource containers had a value approaching $ 260,000. We described in detail in Noonan the manner in which the price was established by David Dixon and the circular attempt to support that price by expert testimony and appraisal. We there also discussed at length the lack of reality or reasonableness to the projected earnings of the containers. None of petitioners here can refer to anything other than the FoodSource promotional *247 materials that they received (but did not offer in evidence) as reflecting anyone's belief in the value claimed for the containers. Petitioners argue that the test for reasonable bassis under section 6659 should be equivalent of the standards required to avoid the addition to tax for negligence under section 6653. There is no support for petitioners' argument, and it is contrary to the express language of section 6659. As petitioners acknowledge in their brief: With negligence, the burden of proof lies with the taxpayer in attempting to prove the penalty has been erroneously imposed. The problem is section 6659 is written differently than section 6653, in that, under section 6653, the Secretary asserts, and the taxpayer disproves. In section 6659, although the Code section should not and logically is not aimed at honest errors in determining adjusted basis due to mistaken interpretations of law, where the 150% error margin is reached, the statute applies, subject to Secretary's waiver authority. * * * It is not our function generally to supervise respondent's settlement posture with respect to section 6659 or to establish guidelines for waiver of that *248 addition to tax. We see no reason to speculate as to circumstances that might require a waiver when we are deciding cases where the circumstances so clearly do not justify a waiver. Section 6659 applies, in the first instance, regardless of fault. Waiver is obviously intended to be the exception, not the rule. Valuation overstatements claimed by these petitioners on their tax returns fall well within the universe of transactions intended to be sanctioned by section 6659. In the closing paragraphs of their reply brief, petitioners ask the Court to allow "the real loss of out-of-pocket expenses" they incurred. The only payments substantiated in the record were the down payments on their interests in the FoodSources containers, which they claim that they owned during the years in issue. Obviously no deduction of those amounts can be allowed. Decisions will be entered under Rule 155.
Footnotes
1. The "test case petitioners" listed below are consolidated herewith. Because of the use of joint petitions in these proceedings, the test case petitioner(s) in each docket number are not the first petitioner(s) listed in their respective petitions. They are set forth below in all capital letters and are listed by caption of the first petitioner(s) in each petition followed by a parenthetical of the test case petitioner(s), and by the docket number. The test case petitioners consolidated herewith are as follows: Paul O. Allen and Leslie G. Allen, et al. (as to LOUISE LUDWIG only), docket No. 10859-85; Sylvia Altman, et al. (as to JOHN O. HILES and JOANNE HILES only), docket No. 15725-85; Edgar J. Augustine and Mary E. Augustine, et al. (as to EDWARD F. SPANG and MARLENE P. SPANG only), docket No. 18348-85; and Albert E. Ingalls and Kathleen M. Ingalls, et al. (as to STEVEN R. BRAND and LORINE BRAND only), docket No. 45848-85. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the years in issue.↩
*. 50 percent of the interest due on $ 6,966.00. ↩
**. 50 percent of the interest due on $ 3,727.00. ↩
***. To be computed at a later date. ↩
3. See Sutton v. Commissioner,84 T.C. 210 (1985), affd. per curiam 788 F.2d 695↩ (11th Cir. 1986). 4. During trial of these cases, the Court sustained respondent's objection, ruled that evidence concerning respondent's settlement practice was irrelevant, and ordered it stricken. Because respondent's brief contained proposed findings and arguments concerning the settlement position, the order made at trial was vacated. The findings set forth in this paragraph were requested by respondent and are included solely for informational purposes. For reasons discussed below, they are not material to the Court's determination in this case. ↩
5. Respondent argues that we applied too lax a standard of profit objective in Noonan v. Commissioner,T.C. Memo. 1986-449. Because petitioners do not satisfy the standard there applied, we need not here revisit that argument. Misconstruing Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987), respondent also "takes exception" to what he characterizes is a "presumption of a profit motive in generic tax shelter cases." To the contrary, Rose stated that in generic tax shelters "tax motivation is apparent. The question [there] addressed is whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits." 88 T.C. at 412↩. 6. Sec. 183(c) provides as follows: (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 7. Sec. 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows: (1) Manner in which the taxpayer carried on the activity. (2) The expertise of the taxpayer or his advisors. (3) The time and effort expended by the taxpayer in carrying on the activity. (4) Expectation that assets used in activity may appreciate in value. (5) The success of the taxpayer in carrying on other similar or dissimilar activities. (6) The taxpayer's history of income or losses with respect to the activity. (7) The amount of occasional profits, if any, which are earned. (8) The financial status of the taxpayer. (9) Elements of personal pleasure or recreation. ↩