ARNE CHRISTENSEN, JR., ET. AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Christensen v. Commissioner
Docket Nos. 9225-84, 34735-86, 32738-86
United States Tax Court
T.C. Memo 1988-484; 1988 Tax Ct. Memo LEXIS 511; 56 T.C.M. (CCH) 425; T.C.M. (RIA) 88484; October 5, 1988
Robert *512 C. Weaver and Jeffrey E. Boly, for the petitioners. Gerald Douglas and Paul Robeck, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner Arne Christensen, Jr.'s, Federal income taxes for 1981 through 1983 in the following amounts: 1981
$  3,351.00
1982
$  5,498.00
1983
$ 14,036.00
Respondent also determined a deficiency in the amount of $ 5,186.76 in petitioners Arne and Virginia Christensen's Federal income tax for 1984. After concessions, the issue for decision is whether petitioner Arne Christen, Jr.'s invention and metal fabrication activities constitute a trade or business within the meaning of sections 162(a), [2]174(a)(1), and 183(a) for 1981, 1982, 1983, and 1984. FINDINGS OF FACT At the time of the filing of the petition, petitioners resided in Newport, Oregon. Arne Christensen, Jr. (hereinafter petitioner), and Virginia Christensen (hereinafter Mrs. Christensen) were married in 1984. Since mid-1977 and continuing *513 through the years in issue, 1981 through 1984, petitioner has been employed full time by Northwest Natural Gas Co. (Northwest) in Newport, Oregon, as a liquid natural gas operator. In this position, petitioner earned approximately $ 35,000 per year. Prior to his employment with Northwest, petitioner held a number of jobs involving mechanics and engineering. He worked as an engineer on a commercial fishing boat, as a diesel mechanic, as an automobile mechanic, and as a metal fabricator. While working in those jobs, petitioner also devoted a great deal of his time to attempted inventions of mechanical items and metal fabrication projects. In 1969, he built a small self-propelled toy car for his children. This project was the beginning of what he later called the Pixie Car. The Pixie Cars
In late 1969 or early 1970, petitioner decided to give up his regular job and devote his time to the construction of a set of small gasoline-propelled cars, known as Pixie Cars, and a track and to the use of the cars as amusement rides for children. He also considered the possible sale of the cars. Petitioner formed a partnership with C. R. Rogers (Rogers) to work with him on the venture. *514 They rented a shop, acquired machinery, and built eight cars and a wooden track. During 1970 through 1972, they took the cars, which had been certified by the State of Oregon to be safe for use, to local fairs and carnivals and provided rides for adults and children for a charge of 50 cents per person. In 1970 and 1971, petitioner and Rogers netted as much as $ 1,300 in one day. The cars and track used during this period were not always efficient because of a variety of mechanical problems and defects. In an effort to deal with these problems, petitioner made numerous changes in the cars and the track. The owner of Playland Amusement, a carnival show and amusement company, offered petitioner $ 33,000 for the cars and track but petitioner refused the offer because he felt that, until the cars were improved, a new owner could not use them profitably. At the end of the 1972 season, Rogers withdrew from the partnership. Under the termination agreement, Rogers took the cash on hand and petitioner retained the Pixie Cars. In 1972, petitioner and Fred Hay (Hay) set up an organization known as Custom Fabricating Company. They agreed that all inventions and fabricated items would *515 belong to the partnership except the Pixie Cars which petitioner would keep. At this point, petitioner decided to discontinue use of the Pixie Cars until he could obtain enough capital to develop more reliable vehicles. He intended, however, to continue to study and work on the cars until they became more durable and reliable. Hay stayed with the partnership for about 2 years, until October 1973, and, thereafter, petitioner operated Custom Fabricating as a sole proprietorship. In May 1977, petitioner took a job with Northwest to provide a living for himself and his family and to obtain capital for his Custom Fabricating shop. At Northwest, he worked 11 consecutive days and then had 4 days off work. On the days he did not work for Northwest, he spent at least 8 hours a day working in his Custom Fabricating shop. In addition, on the Northwest work days he usually worked several hours in his shop after he came home. During this period, petitioner had as many as 85 different projects under way in his shop. He regarded six or eight of these projects as ones of primary interest. A consultant advised him to select one project and concentrate on it. In 1980 or 1981, he decided *516 to devote his shop time primarily to the Pixie Cars but he spent some time on a few other undertakings. From 1977 to 1984, while working on Custom Fabricating projects, petitioner designed and redesigned possible improvements in the Pixie Car. He corresponded with various manufacturers and supply houses in search of suitable parts and materials. In 1977 and 1983 he completed two prototypes of improved Pixie Cars. After testing components he made several bulk purchases: 50 Kohler engines, 300 steering wheels, and 85 wheels and other components costing hundreds of dollars. Between the fall of 1982 and the fall of 1983, progress on the improved Pixie Car was interrupted when Custom Fabricating was evicted from its place of business, for which petitioner paid rent of $ 80 per month, and was forced to relocate. While the dispute over petitioner's improvements to the property was pending, he did not have a place to work. A lawsuit followed, and on September 9, 1983, petitioner received $ 12,737.64 in satisfaction of a judgment which he obtained to compensate him for improvements he had made on the leased premises. He rented a new building at a cost of $ 500 per month and converted *517 it into a suitable workshop. By April 1985, six of the improved Pixie Cars were completed. Petitioner rented a lot near Newport, Oregon, constructed a stainless steel track on the lot, and began operating the Pixie Car Ride. In 1985, petitioner completed nine more Pixie Cars bringing the total to 15 cars. He operated the improved Pixie Cars at carnivals and fairs in 1985 and 1986, netting approximately $ 4,000 in 1985. In 1985, Don Nelson, owner of Playland Amusement offered to buy the improved Pixie Car Ride for approximately $ 250,000 if petitioner would construct and include a semi-truck and tractor trailer to transport the ride, track, and all necessary equipment. Petitioner immediately began working on a semi-truck and tractor trailer equipped with hoisting and hauling devices, signs, a sound system, water, fuel, and living accommodations for the operators. The project was almost completed at the time of the trial. Shrimp-Trash Machine
In about 1972, petitioner invented the shrimp-trash machine for use in the shrimping industry for separating the shrimp catch from the trash fish. For the development of this invention, petitioner received a grant of $ 5,000 *518 from the Marine Science Center of Oregon State University. He also received financing in the amount of $ 10,000 from a private investor. On March 25, 1974, petitioner sold his rights to manufacture and sell the shrimp-trash machine to Wilcox Manufacturing Company (Wilcox) in exchange for a royalty payment of $ 1,000 for each machine Wilcox sold. In the mid-1970's, Wilcox sold between 15 and 20 shrimp machines and petitioner received the agreed royalties. From 1978 to 1984, Wilcox did not sell any shrimp machines because the local shrimp industry virtually collapsed. As a result, petitioner did not receive any royalties. In 1986, after the local shrimp industry revived, petitioner received a royalty of $ 1,000. Dune Buggies
In 1973, petitioner built two dune buggies, i.e., recreational vehicles used to drive over sand dunes. The dune buggies he made had a distinctive suspension system and had a Corvair motor whereas most dune buggies had a Volkswagen motor. The suspension system developed for the dune buggies was later used for the Pixie Car. To market the dune buggies, petitioner worked out an arrangement with a company in Newport, Oregon. He was able to sell one *519 of the dune buggies, which had cost "far less than $ 1,000, for $ 1,500 in 1975. Shortly thereafter, strict rules on the use of dune buggies severely reduced the possible market. King Crab Traps
In the mid-1970's, petitioner designed, built, tested, and sold several king crab traps weighing between 600 and 800 pounds each for use in the fishing industry. Petitioner's ledger shows receipts from companies called Atlantico and Rondys in connection with this project: Date
Payor
Amount
1/11/76
Atlantico
$   465.00
3/ 2/76
Atlantico
$   916.00
3/12/76
Atlantico
$   130.00
2/28/76
Rondys
$   219.00
6/ 4/76
Rondys
$   676.00
6/25/76
Rondys
$   512.00
7/27/76
Rondys
$   481.00
10/29/76
Atlantico
$ 1,000.55
Winos, Dingbats, and Riffraff
Beginning in 1979 and continuing to the date of the trial, petitioner has been designing, promoting, and selling novelty items bearing the logo "United Brotherhood of Winos, Dingbats and Riffraff" (WDR). On October 9, 1979, he obtained a copyright covering silkscreen reproductions of the logo. In 1980, he purchased for resale a large quantity of T-shirts for approximately *520 $ 4,000 and had the logo imprinted on them. To raise the money for the purchase, he borrowed $ 2,600 from the Bank of Newport. Petitioner hired an individual to sell the T-shirts and other novelty items bearing the logo, and he sold some of them from the street car, described below. On April 30, 1986, petitioner entered into a 3-year license agreement with H. Kent Dahlke authorizing him to market WDR logo items and requiring him to pay petitioner sales royalties as follows: a) 50 cents for each T-Shirt, Sweatshirt, Jacket, and coat sold; b) 25 cents for each Hat, Cap, Suspenders, and Bumper Sticker sold; c) 10 cents for each window sticker and decal sold; d) $ 3.00 for each Charter Member Pin sold; e) An amount to be negotiated between the parties for each item not mentioned in paragraphs (a) through (d) above.
Royalty payments are to be paid not less often than annually following the close of the tourist season and not later than October 31 of each year. Petitioner received royalties from the WDR logo of $ 276 in 1986, $ 200 to $ 300 in 1987, and at the time of the trial anticipated over $ 400 in 1988. The Street Car
In 1979, petitioner build a self-propelled *521 vehicle resembling a San Francisco cable car. Originally, he used the car as a parade float to advertise WDR novelty items. Later, he used it as a store from which he marketed such items. Still later, he converted the street car into a licensed restaurant which he rented to individuals for use as a hot dog stand. In 1986, he sold the street car for $ 3,500 which he reinvested in Custom Fabricating. Management of Fabrication Activities
From 1972 to 1986, petitioner, with the assistance of Mrs. Christensen and other family members, maintained a separate ledger for Custom Fabricating. The ledger shows deposits and expenses, a chart of accounts, and separate account columns. The ledger has been kept current and it was used for the preparation of Federal tax returns for 1981 through 1984, the years here in dispute. In addition to the ledger, petitioner has retained documents supporting the ledger entries. For Custom Fabricating, petitioner has maintained a separate bank account and has retained all bank statements and canceled checks. Between 1981 and 1984, petitioner and his family lived on approximately $ 500 to $ 600 per month. The remainder of the income has been *522 invested in Custom Fabricating, primarily for the development, production, and use of the Pixie Car assembly and other Custom Fabricating projects. In addition to using much of his own income on the fabrication projects, he borrowed thousands of dollars from his son, primarily to complete the Pixie Car project. The parties have stipulated that petitioners can substantiate the expenses in the amounts claimed on their tax returns for the 4 years at issue. On his income tax returns for 1981, 1982, 1983, and 1984, petitioner claimed Schedule C losses from Custom Fabricating, which he described as "New inventions" on his returns for the first 3 years and as "Fabricating Small Cars" on the 1984 return. The returns disclosed the following income and expenses: Year
Income
Deductions
Loss
Other Income
1981
-0-
$  9,282.97
$  9,282.97
$ 31,017
1982
-0-
$ 16,679.75
$ 16,697.75
$ 33,346
1983
$ 733.26
$ 28,996.14
$ 28,262.88
$ 35,558
1984
$ 545.00
$ 27,012.00
$ 26,467.00
$ 37,101
Included in the deducted amounts were the following outlays labeled research and development: 1981
$  1,479.19
1982
$  4,927.37
1983
$  7,556.52
1984
$ 13,191.00
*523 On their joint return for 1985, petitioners claimed an operating loss of $ 32,314 with respect to the Custom Fabricating activity. The 1985 return was audited in July 1987 and the auditor was informed of the pendency of the instant cases. As a result of his investigation, the auditor issued a report concluding that Custom Fabricating satisfied the trade or business requirements of sections 162 and 183 and that the claimed losses were allowable. Based on his investigation, the auditor recommended that no audit be performed with respect to petitioners' 1986 return. In the notices of deficiency, respondent disallowed the deductions claimed by petitioner and Mrs. Christensen with respect to Custom Fabricating. OPINION Petitioners contend that they are entitled to the Schedule C deductions claimed on their income tax returns for 1981 through 1984 under section 162(a) and, in part, under section 174(a) because the expenditures reflected by the deductions were paid in operating Custom Fabricating, a business engaged in for profit. Respondent argues that petitioner did not have an actual and honest objective of making a profit from Custom Fabricating and that it was not, therefore, *524 a trade or business within the meaning of sections 162(a) and 174(a). In making this argument, respondent describes petitioner's work in Custom Fabricating as recreational activity by one who "loves machinery and automobiles." Section 162(a)[3] allows deductions for all ordinary and necessary expenses paid or incurred in "carrying on any trade or business." Section 174(a)(1)[4] permits the deduction of research or experimental expenditures incurred "in connection with" a trade or business. Section 183(a)[5] allows a deduction for expenditures incurred in an activity not engaged in for profit only to the extent of the income derived from the activity. The key issue is, thus, whether Custom Fabricating was a trade or business or an activity not engaged in for profit during the years 1981 through 1984. *525 We find that petitioner's expenditures for the operation of Custom Fabricating were paid or incurred in carrying on a trade or business within the meaning of section 162(a). We need not, therefore, deal with the somewhat less onerous requirements of section 174(a)(1). See Snow v. Commissioner,416 U.S. 500, 503 (1974). In Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981), the Court stated the test to be applied as follows: The test for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the individual's primary purpose and intention in engaging in the activity is to make a profit. * * * The taxpayer's expectation of profit need not be a reasonable one; it is sufficient if the taxpayer has a bona fide * * * [objective] of realizing a profit regardless of the reasonableness of such expectation. Sec. 1.183-2(a), Income Tax Regs.; Mercer v. Commissioner,375 F.2d 708, 710-711 (9th Cir. 1967), *526 revg. a Memorandum Opinion of this Court; * * *
Stated another way, to be entitled to trade or business expense deductions, the taxpayer must have an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In Commissioner v. Groetzinger,480 U.S. 23,    (1987), the Supreme Court stated that -- to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify.
Some of the relevant factors to be considered in evaluating whether an activity is a business or a hobby are listed in section 1.183-2(b), Income Tax Regs., including: (1) the manner in which the taxpayer carried on the activity; (2) the *527 expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Not all of these factors are applicable in every case and no one factor is conclusive in making the determination. Allen v. Commissioner,72 T.C. 28, 34 (1979). We begin our analysis with the fact that the years here in issue, 1981 through 1984, are bracketed by a long period of time, 1969 to mid-1977, in which petitioner devoted his entire time to inventing or fabricating items which produced income and the years 1985 and 1986 which, after audit during the pendency of this case, the Internal Revenue Service allowed deductions similar to ones here in dispute. Although the Internal Revenue Service audit determination may not be relevant *528 evidence as to the years in controversy, it establishes that we are here dealing with an isolated period. Our findings list some of the petitioner's income-producing projects during the period prior to, and continuing through, the years in dispute: the shrimp-trash machine, the dune buggies, the king crab traps, the Winos, Dingbats and Riffraff (WDR) logo, the street car, and the Pixie Cars. The shrimp-trash machine and the WDR logo were still producing income at least as late as 1986, and the street car was sold for $ 3,500 in that year. We think this variety of projects is sufficient to show that petitioner was engaged in an invention and fabrication activity with "continuity and regularity." Commissioner v. Groetzinger,480 U.S. at 35. The issue remaining is whether he had a bona fide profit objective. During the early years of Custom Fabricating, from 1969 through mid-1977, petitioner worked in his shop full time and depended upon his earnings from that source for his livelihood. That the endeavor was a section 162(a) trade or business during that period could hardly be denied. After he accepted employment with Northwest in mid-1977, petitioner continued *529 to work long hours in the shop and sought to make a profit from his work. True, petitioner's shop work was interrupted in 1982 and 1983 by his eviction from his leased shop and the lawsuit which followed. But there is no suggestion that the eviction caused him to abandon the undertaking. Petitioner rented a new shop at a cost of $ 500 per month as soon as practicable and continued his metal fabrication and invention activities. During the years in issue, excepting possibly the period when his right to his shop was in litigation, petitioner spent all available funds and long hours of hard, dirty work on his Pixie Car and other projects. Such work could hardly be called recreation. As stated in our findings, he made bulk purchases of engines, steering wheels, and other components for use in the Pixie Cars and other fabricated items. The amounts of these purchases are hardly consistent with the concept of a hobby. Petitioner made sales of, or received royalties from, some of the items he produced through his efforts. Petitioner's income from Northwest was certainly not great enough to suggest that he could afford to make his large cash outlays to support a hobby or other recreation *530 of the magnitude reflected by his Custom Fabricating activity. While petitioner did not realize a profit and incurred substantial losses from his fabricating operations, we are convinced he made a bona fide effort to make a profit and that he had a bona fide objective of so doing. He kept complete and accurate records of his income and expenses and it is stipulated that all expenses claimed as deductions have been substantiated. See Engdahl v. Commissioner,72 T.C. 659, 666-667 (1979). This is not a case of an individual who has devoted a few hours from time to time to a recreational activity or an activity he knew nothing about. Petitioner devoted many, many long hours of work in his shop on projects within the field of his mechanical and metal fabricating expertise. He realized income from his shrimp-trash machine, dune buggies, street car, and WDR logo projects as well as sporadic income from his Pixie Car project which he has developed into a valuable asset. The significant amount of time that petitioner regularly and continuously devoted to his fabrication work, nonrecreational in character, is persuasive evidence of a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs.
*531 True, petitioner incurred substantial losses over a considerable period of time but we do not find that fact decisive in this case. The Pixie Car project was an enormous undertaking which, in the best of circumstances, could hardly be expected to be immediately profitable. The 1982 and 1983 dispute over his work lease caused a further unforeseen delay in his Pixie Car work. See Engdahl v. Commissioner, supra at 669; sec. 1.183-2(b)(6), Income Tax Regs. Given the magnitude of the Pixie Car and related transportation facility project, its unique character and the problems he has faced in completing it, we do not think the history of petitioner's losses is decisive. We emphasize that we are not here dealing with a wealthy individual who has adopted a tax-saving scheme based on nonrecourse financing designed to offset income from other sources with paper losses. Instead, the disputed deductions involve only cash expenditures. A very substantial portion of petitioner's annual salary of approximately $ 35,000 was consumed by these cash outlays on his Custom Fabricating projects. In addition, petitioner's son loaned him thousands of dollars *532 for use in the Pixie Car project. Although we give greater weight to the objective facts than to petitioner's statements, we have no substantial ground for rejecting petitioner's assertion that his purpose was to produce income which would supplement his rather modest wages and ultimately provide a source of income for his retirement. [6] As stated in Engdahl v. Commissioner, supra at 670: We think it unlikely that petitioners would embark on a hobby costing thousands of dollars and entailing much personal physical labor without a profit motive. * * * Our task is not to second-guess petitioner's judgment on the prospects of his financial success in carrying out his Custom Fabricating projects. The income tax regulations clearly provide that "a reasonable expectation of profit is not required" and that "it may be sufficient that there is a small chance of making a large profit." Sec. 1.183-2(a), Income Tax Regs. And the courts have repeatedly *533 explained "the expectation of the taxpayer need not be reasonable, and immediate profit from the business is not necessary." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Lamont v. Commissioner,339 F.2d 377, 380 (2d Cir. 1964), affg. an order of this Court; Golanty v. Commissioner,72 T.C. at 425. Petitioner has shown that, in incurring the expenses for which the disputed deductions were claimed, he had an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. at 645. That is sufficient to support the disputed deductions. To reflect the foregoing and other issues settled by the parties, Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: Arne Christensen, Jr. and Virginia Christensen, docket No. 32735-86, and Arne Christensen, Jr., docket No. 32738-86. ↩
2. All section references are to the Internal Revenue code of 1954, as amended, unless otherwise noted. ↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
4. SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES. (a) Treatment as Expenses. -- (1) In general. -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. ↩
5. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions for which would be allowable under this chapter for the taxable year only if such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. * * * ↩
6. Respondent makes no contention that any part of the expenditures in issue should be capitalized. ↩